**Ann McLAUGHLIN, Secretary of The United States Department of Labor, Plaintiff,**

v.

**Fred COMPTON, Joseph McHugh, John Neilson, Frederick Hammerschmidt, Gersil N. Kay, Electrical Mechanics Association, the Fidelity–Philadelphia Trust Company and the International Brotherhood of Electrical Workers, Local 98, Defendants.**

Civ. A. No. 88–7920.

United States District Court, E.D. Pennsylvania.

July 21, 1993.

744

William Tedesco, U.S. Dept. of Labor, Office of the Sol., Philadelphia, PA, Brenda Joyce Stovall, U.S. Dept. of Labor, Office of Gen. Counsel, Plan Benefits Div., Washington, DC, for plaintiff.

Laurance E. Baccini, Wolf, Block, Schorr and Solis–Cohen, Bernard N. Katz, Michael Katz, Adam H. Feinstein, Meranze and Katz, Harry P. Blackburn, Beth Z. Palubinsky, N. Marlene Fleming, Blackburn & Michelman, Richard C. McNeill, Richard B. Sigmond,

Sagot, Jennings & Sigmond, Philadelphia, PA, for defendants.

## MEMORANDUM

ANITA B. BRODY, District Judge.

By the accompanying order, I am vacating my February 11, 1993 order denying the summary judgment motion of plaintiff, the Secretary of the Department of Labor ("the Secretary"), on his complaint alleging violations of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, by Local Union No. 98 International Brotherhood of Electrical Workers Pension Plan ("the Plan") fiduciaries Fred Compton ("Compton"), Joseph McHugh ("McHugh"), John Neilson ("Neilson"), Frederick Hammerschmidt ("Hammerschmidt"), Gersil Kay ("Kay") and the Fidelity–Philadelphia Trust Company ("Fidelity"), and by Plan non-fiduciaries the International Brotherhood of Electrical Workers Local 98 ("Local 98") and the Electrical Mechanics Association ("EMA").

I am being called upon to decide whether ERISA allows me to pierce the corporate veil of a corporation that is not a "party in interest" to the plan as defined by the statute but which is closely related to—but not co-extensive with—a labor organization that is a "party in interest" to the plan in order to find that the pension plan's loan mortgage and subsequent sale of the mortgage note to the corporation is a prohibited "party in interest" transaction. I find that it does not and enter judgment as a matter of law in favor of the non-moving defendants.

### A. *Procedural background.*

The parties had completed briefing the Secretary's summary judgment motion when this case was reassigned to me from the Honorable J. Franklin Van Antwerpen on January 4, 1993. The Secretary identified seventy-two "undisputed" material facts that he contended entitled him to summary judgment. Fidelity and the employer trustees (Hammerschmidt and Kay) admitted most of these facts in their responsive brief.

The parties were unable to identify any disputed material facts during oral argument on January 14, 1993. Local 98 and EMA, however, asked me to consider additional facts that they considered relevant to the threshold issue of whether EMA is the alter ego of Local 98, a real party in interest to the Plan under the statute. They also argued—and I was concerned—that the law of the Third Circuit considers the ability to pierce a corporate veil to be a "fact-intensive question" that requires full factual development at trial. *See, e.g., United States v. Pisani*, 646 F.2d 83 (3rd Cir.1981) (district court pierced corporate veil after bench trial).

I was reluctant to foreclose any opportunity for the parties to present further facts that could impact on my determination of whether EMA is an alter ego of Local 98. Nonetheless, it was apparent that a full bench trial was unnecessary because there were no credibility issues and that the testimony at trial might merely reiterate admissions already in the record.

I suggested that the parties consider the possibility of my adjudicating the case on the submitted record rather than in the procedural context of a motion for summary judgment. Each party would have an opportunity to amplify the summary judgment record. I also explained that if no party requested cross-examination of any affidavits submitted as part of the record, there would be no need to present live testimony. When the parties responded that they had no objection to my proposal, I issued the following order:

AND NOW, this 11th day of February, 1993, it is ORDERED that plaintiff's motion for summary judgment is DENIED.

It is further ORDERED that the trial shall proceed as a bench trial on the record submitted by the parties and amplified as follows:

1. By February 19, 1993, defendants Compton, McHugh, Neilson, Electrical Mechanics Association and Local 98 shall file and serve responses in numbered paragraphs admitting or denying the numbered paragraphs setting forth the plaintiff Secretary's statement of material facts and the additional material facts identified by Fidelity, Hammerschmidt and Kay.

2. By April 15, 1993, each party shall file and serve (1) any further evidence, including any affidavits and exhibits, that they wish to be considered and which are not yet a part of the record, and (2) any further proposed findings of fact in numbered paragraphs.

3. By April 30, 1993, each party shall file and serve responses in numbered paragraphs admitting or denying any further proposed findings of fact submitted on April 15, 1993.

4. By April 30, 1993, each party shall file and serve its proposed conclusions of law and a statement of any evidentiary objections to the evidence submitted to the Court. The parties shall also identify any areas of cross-examination on the affidavits submitted as part of the record which the Court may consider hearing.

5. This case shall be stricken from the trial pool.

The Secretary, Local 98 and EMA submitted additional proposed findings of fact on April 15, 1993. The Secretary subsequently admitted all but one of Local 98 and EMA's proposed findings of fact.[1] This exercise confirmed that all of the material facts relevant to the issues before me are undisputed by the parties.[2] On May 10, 1993, the parties submitted their proposed conclusions of law.

On June 1, 1993, the United States Supreme Court decided *Mertens v. Hewitt Associates,* — U.S. —, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). I issued an order on June 8, 1993 allowing the parties until June 25, 1993 to submit briefs addressing the impact of *Mertens,* if any, on the instant case.

■ The impact of *Mertens* on the instant case has caused me to reconsider my prior order simply denying the Secretary's motion for summary judgment. As I may modify or rescind a prior interlocutory order at any time until a final decree is entered, I will vacate my February 11, 1993 order denying the Secretary's summary judgment motion. Federal Rule of Civil Procedure 54(b) ("... the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of the parties."). *See also Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 185 (5th Cir.1990) ("... we acknowledge that a new decision clarifying the applicable law may justify reexamining a denial of summary judgment."); *Kenyatta v. Moore,* 623 F.Supp. 220, 222 (D.C.Miss.1985).

■ *Mertens* now compels me to enter judgment in favor of the nonmoving defendants. A leading commentator notes that "the weight of the authority is that summary judgment may be rendered in favor of the opposing party even though he has made no formal cross-motion under rule 56." 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil 2d § 2720 (1983) (collecting cases). *See also Johnson v. Bismarck Public School Dist.,* 949 F.2d 1000, 1004–05 (8th Cir.1991) (affirming summary judgment in favor of non-moving party where movant asked court to rule on issue on summary judgment basis and there was no showing that movant did not have full and fair opportunity to develop the record); *Missouri Pacific Railroad v. National Milling Co.,* 409 F.2d 882, 885 (3rd Cir.1969) (summary judgment properly awarded to non-moving party in absence of cross-motion where record supported result); *Selected Risks Ins. Co. v. Bruno,* 555 F.Supp. 590, 595 (M.D.Pa. 1982), *rev'd on other grounds,* 718 F.2d 67 (3rd Cir.1983).

Wright and Miller cautions that "whenever the court believes that the non-moving party is entitled to judgment, great care must be exercised to assure that the original movant has had an adequate opportunity to show that there is a genuine issue and that his opponent is not entitled to judgment as a matter of law." Since my denial of summary judgment, the parties have expanded and amplified the record and briefed the applicable law. I now determine that, under the current law, the Secretary cannot maintain this action on these facts as a matter of law.

---

1. The Secretary admitted three of the 25 proposed findings of facts "with qualification."

2. The facts recited in this opinion are all admitted facts unless otherwise noted.

**B.** *Because ERISA must be strictly construed, the defendants did not violate prohibitions on party in interest transactions because EMA was not a party in interest as defined by the statute.*

▆ The threshold question in this protracted litigation is whether ERISA prohibitions enacted in 1974 against transactions between a pension plan and a party in interest to the plan required the defendants to correct a 1972 mortgage loan by the Plan to EMA, a non-profit corporation incorporated in the 1920's to promote unity among and further instruction to members of the electrical trade.

The Secretary admits that EMA is not a party in interest to the Plan, but asks that I pierce EMA's corporate veil to find that the Plan's loan to EMA was, in fact, a prohibited loan to Local 98, an admitted party in interest. Prior to *Mertens,* I may have been inclined to pursue the alter ego analysis. However, after the instruction in *Mertens,* I clearly cannot impose liability unless the statute explicitly prohibits the challenged transactions as a party in interest transaction.[3]

In *Mertens,* the Supreme Court forcefully reiterated earlier directives to strictly construe the statute. *See, e.g., Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 146–47, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96 (1985) ("We are reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA.") The plan participants in *Mertens* sued the plan's actuary for monetary relief when the plan was terminated after its assets were inadequately funded because the actuary failed to change the actuarial assumptions to reflect the additional costs imposed by a large number of early retirements.

The Court first questioned whether the actuary, a non-fiduciary, violated ERISA if it knowingly participated in fiduciary breaches. Acknowledging the absence of explicit statutory authority to impose liability on non-fiduciaries for knowing participation, the Court expressed its "unwillingness to infer causes of action in the ERISA context, since that statute's carefully drafted and detailed enforcement scheme provides 'strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly.'" —— U.S. at ——, 113 S.Ct. at 2067 (quoting *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 146–47, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96 (1985)).

The majority rebutted the dissent's assumption that there was a cause of action against non-fiduciaries for knowing participation because a claim against non-fiduciaries was not barred by ERISA: "The issue is whether the statute affirmatively authorizes such a suit." *Id.* —— U.S. at ——, n. 5, 113 S.Ct. at 2068 n. 5. However, because the parties assumed that there had been a violation of ERISA, the Court limited its ruling to the issue of whether a complainant could obtain monetary relief against a non-fiduciary who knowingly participated in a fiduciary breach. The Court held that "equitable relief" authorized by the statute did not include monetary relief.

---

**3.** The Secretary's complaint seeks injunctive and monetary relief pursuant to sections 502(a)(2) and (5) of ERISA, 29 U.S.C. § 1132(a)(2) and (5), for alleged violations of ERISA's statutory prohibitions against certain transactions between a pension plan and a party in interest to the plan.

Section 502(a)(2) authorizes the Secretary to commence a civil action for appropriate relief under section 1109 of ERISA setting forth statutory liability for breach of fiduciary duties to a plan. Contrary to Fidelity's position in its final brief, I find that the Secretary's complaint states a claim under section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2).

Section 502(a)(5) authorizes the Secretary to commence a civil action to enjoin any act or practice which violates any provision of ERISA or to obtain any other appropriate equitable relief to redress violation or enforce the provisions of ERISA.

In *Mertens,* the United States Supreme Court addressed section 502(a)(3), 29 U.S.C. § 1132(a)(3), the civil enforcement provision of ERISA that authorizes plan participants to commence a civil action to enjoin any act or practice which violates any provision of ERISA or to obtain any other appropriate equitable relief to redress violations or enforce the provisions of ERISA.

The Secretary concedes that *Mertens* applies "presumably, [to] the parallel provisions of § 502(a)(5) governing suits by the Secretary such as the instant one." *See* the Secretary's brief regarding *Mertens* at ——, 113 S.Ct. at 2064.

Although it acknowledged that ERISA has roots in the common law of trusts which permitted equity courts to assess money damages against a trustee, the Court nonetheless strictly construed ERISA to permit only traditional forms of equitable relief such as mandamus and restitution. By excluding money damages under this provision, the Court insured that the meaning of equitable relief would be consistent throughout the statute and preserved the distinctions between "equitable," "remedial" and "legal" relief that Congress intended to draw in the text of the statute. *Id.* at —— – ——, 113 S.Ct. at 2070.

The Court rejected arguments to interpret "equitable relief" to include monetary relief "in order to achieve the 'purpose of ERISA to protect plan participants and beneficiaries.'" *Id.* at ——, 113 S.Ct. at 2071 (citation omitted). Because the complex ERISA legislation as enacted "resolved innumerable disputes between powerful competing interests—not all in favor of potential plaintiffs," the Court held that "[w]e will not attempt to adjust the balance between those competing goals [of benefitting employees and containing pension costs] that the text adopted by Congress has struck." *Id.*

Here, the seminal transaction between the Plan and EMA predated the 1974 enactment of the statute. On January 4, 1972, the Plan loaned EMA $800,000 at 7½% interest for a 30 year term ending February 1, 2003 to finance a building constructed at 1719–29 Spring Garden Street in which EMA intended to house its apprenticeship training program. The note evidencing the debt was secured by a mortgage on the property.

ERISA was enacted in 1974. One of the provisions of the new statute prohibited certain transactions between a plan and a party in interest to the plan:

A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

Section 406(a)(1), 29 U.S.C. § 1106(a)(1).

Under the transition rule codified at 29 U.S.C. § 1114(c)(1), Congress extended an "exemption" period until June 30, 1984 to allow a plan to correct prior transactions entered before July 1, 1974 which would have been prohibited as party in interest transactions after the statute was enacted.

On April 30, 1984, the Plan submitted an application for exemption from the prohibited transaction provisions of ERISA to allow the continuation of the mortgage between the Plan and the EMA. On June 1, 1984, the Department of Labor informed Plan counsel that it had "tentatively decided not to propose the requested exemption." The then-current market conditions adversely effected the marketability of the mortgage and the Plan continued to hold the note after the statutory exemption period expired on June 30, 1984.

On September 10, 1984, the United States Department of Labor granted the Plan's request that its exemption application be withdrawn. On March 5, 1985, Fidelity reported the value of the mortgage held by the Plan as $380,289.93. On April 25, 1985, the trustees sold the note to EMA for $380,289.93. Fidelity received a $380,289.93 check from EMA and deposited it into Fidelity's trust funds checking account. The Plan's account was credited for this amount. Fidelity reprocessed the sale of the mortgage and executed a Mortgage Satisfaction piece and removed the mortgage from its trust fund. The Plan trustees reinvested the proceeds of the sale.

The Secretary now claims that the defendants violated ERISA's prohibitions on transactions with parties in interest with a plan when they did not "correct" the EMA mortgage and note before the exemption deadline and when they subsequently caused the Plan to sell the note to EMA.

The Secretary has admitted that EMA is not a party in interest to the Plan.[4] This concession alone is a sufficient basis to enter judgment on his claims that the Plan's transactions with EMA violated the statute's party in interest prohibitions.

■ However, in the event that this admission by the complaining party is insufficient, I will make an independent finding that EMA is not a party in interest to the Plan. The statute defines a "party in interest" as including (A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such benefit plan; (B) any person providing services to such plan; (C) an employer any of whose members are covered by such plan; and (D) an employee organization any of whose members are covered by such plan. Section 3(14)(A)–(D) of ERISA, 29 U.S.C. § 1002(14)(A)–(D).

Another arguably relevant "party in interest" defined by the statute at section 3(14)(G), 29 U.S.C. § 1002(14)(G) is:

(G) a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of—

(i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation,

(ii) the capital interest or the profits interest of such partnership, or

(iii) the beneficial interest of such trust or estate,

is owned directly or indirectly, or held by .... [a party in interest under the statute] ...;

Employees, officers, directors, and shareholders holding ten percent or more of any of the above-defined parties in interest are also parties in interest to a plan. 29 U.S.C. § 1002(14)(H).

EMA, a non-fiduciary that is not "a labor organization" within the meaning of section 2(5) of the Labor Management Relations Act, as amended, 29 U.S.C. § 152(5), is not an employee organization with members covered by the Plan.[5] Nor does EMA meet the specific statutory criteria enumerated by Congress to designate certain separately incorporated entities as parties in interest to a plan because of their relationship to another party in interest under the statute.

■ The Secretary claims that EMA is an "alter ego" of Local 98 and urges the court to pierce the corporate veil of EMA. The Secretary reasons that the transactions between the Plan and EMA were actually transactions between the Plan and Local 98, an admitted party in interest to the Plan, that violated ERISA section 406(a)(1) prohibitions on transactions between a plan and a party in interest to the plan. This construction contradicts *Mertens'* directive because EMA is not a party in interest within the explicit four corners of section 3(14) of the statute. Because EMA is not itself a party in interest to the Plan under the 1974 statute, the continuation of the original 1972 transaction after the exemption period expired in 1984 did not violate ERISA section 406(a)(1) party in interest prohibitions. Likewise, the 1985 sale of the note by the Plan to EMA was not a prohibited party in interest transaction.[6]

**4.** *See* the Secretary's proposed conclusion of law at —— n. 3, 113 S.Ct. at 2075 n. 3: "The parties agree that defendant EMA was not a party in interest with respect to the Plan."

**5.** Section 3(4) of ERISA, 29 U.S.C. § 1002(4), defines an "employee organization" as:

any labor union or any organization of any kind, or any agency or employee representation committee, association, group, or plan in which employees participate and which exists

for the purpose, in whole or in part, of dealing with employers concerning a employee benefit plan, or other matters incidental to employment relationships; or any employees' beneficiary association organized for the purpose, in whole or in part, of establishing such a plan.

**6.** If it is found on appeal that I should broadly construe the statute to find a violation of ERISA section 406(a)(1) when a plan transacts with a separately incorporated entity that does not meet the statutory definition of a party in interest, I

find that EMA is an alter ego of the admitted party in interest Local 98.

The undisputed facts establish a close—but not co-extensive—relationship between EMA and Local 98.

EMA has regular monthly membership meetings. EMA is funded by dues assessments from its membership in the amount of approximately $1,000 a year and by rental income received from tenants of property owned or held by EMA. Throughout its existence, EMA has purchased and held property which housed various training programs for journeymen and apprentice electricians in accordance with its stated purpose for existence. Rent-paying tenants of EMA have included Local 98, the NECA–Local 98 Joint Apprenticeship Training Program ("JATP") and Community College of Philadelphia.

The persons who have been elected president, vice president, recording secretary and treasurer of local 98 hold those same positions in EMA. Compton was the chairman of both EMA and of its nine member board of directors. EMA's board meets "when necessary." The nine members of the EMA board of directors were not the same individuals who constituted Local 98's executive board. The majority of EMA's board of directors were not trustees of the Plan.

EMA has never had any employees. (Because this fact is admitted by Local 98 and EMA, I find that it is undisputed despite its denial by the union trustees.) It has no business office and has always conducted its business affairs at Local 98's offices. The books and financial records of EMA are maintained by Local 98 employees at Local 98's offices. EMA has "the privilege of using [Local 98's] executive board for meetings. It is only—of course, they have a filing cabinet where they keep the minutes. But that's not an office or anything. It's just a filing cabinet."

Transactions between EMA and Local 98 are disclosed on financial reports as related party transactions "because one cannot assume they're done on an arms length basis, because they're related parties."

As of June 30, 1984, EMA owed Local 98 $230,290.00. This debt consisted primarily of salary expenses that Local 98 paid to one or more of its employees who performed maintenance work at the 1719–29 Spring Garden Street building. Of this amount, Local 98 charged EMA $17,293.00 in maintenance salary expense during the year ending June 30, 1984. The arrangement between Local 98 and EMA (which began prior to 1984) provided that EMA would not pay Local 98 the debt, which would be added to the intercompany payable account. Local 98 never demanded payment of the debt because it viewed transactions between itself and EMA as related party transactions.

The reason the amount of intercompany payables to EMA and intercompany receivables to Local 98 carried on the financial books "grows each year is because the amount that's charged to [EMA] from Local 98 for their proportionate share of primarily salary expenses, just was never paid by EMA to Local 98, so it's a liability account that just keeps increasing each year because no payments are ever made, or if they are made, they're very minor." Salary and other expenses paid by Local 98 for EMA continued to accumulate over the years. For example, "[a]s of June 30, 1987, EMA owed Local 98 $316,328.00, consisting primarily of salary and other expenses paid by Local 98 for EMA" that had accumulated over the years.

During the year ending December 31, 1988, EMA owed Local 98 $559,918.00. According to EMA's accountant, the debt was forgiven by Local 98.

Local 98 and EMA had an established practice of not signing loan documents to record their financial transactions; Local 98's policy is to not charge EMA interest on advances and transfers. (Because these facts are admitted by Local 98 and EMA, I find that they are undisputed despite the denials by the union trustees.)

On April 16, 1985, Local 98 advanced EMA $380,289.93 to purchase the mortgage note at issue from the Plan. Local 98 did not charge EMA interest on the $380,289.93 advance to EMA. A special assessment was imposed on the members of Local 98 to pay for the $380,289.93 advance to EMA because EMA had no way of repaying the loan. EMA repaid the advance to Local 98 out of net cash funds it received from the special assessment. EMA's accountant does not consider this special assessment to constitute rental income because Local 98 advanced cash ($380,289) to EMA and EMA gave cash ($380,289) back to Local 98. EMA received this special assessment until June 1986 when it repaid the entire amount ($380,290.93) to the general fund of Local 98.

Since 1980, Local 98 has leased space in EMA's 1719–29 Spring Garden Street Building. There are no formal lease agreements between Local 98 and EMA. EMA also leases a room on the second floor of 1719–29 Spring Garden Street to the Apprentice Training Fund, a joint apprenticeship training program composed of trustees from Local 98 and the construction industry.

From 1980 through 1988, Local 98 paid EMA $48,000 in annual rent for the space leased at 1719–29 Spring Garden Street. According to former Local 98 and EMA president Thomas Langan, "the trustees of EMA weren't trying to make any money [in charging rent to Local 98]. They were just trying to manage the properties that [EMA] owned."

Under the rent arrangement approved July 26, 1988, Local 98 agreed to pay EMA's expenses and EMA agreed to charge Local 98 rent only after it had exhausted all of its available cash.

Both parties identified the same decisions articulating the standards to be utilized to determine whether, on these facts, EMA is an alter ego of Local 98. These cases hold that the court may not disregard at will the formal differences between affiliated corporations and that the requirements to pierce a corporate veil are demanding; the court should "reluctantly" and "cautiously" proceed to exercise its power to pierce the veil only in "specific and unusual

■ Accordingly, I will enter judgment against the Secretary and in favor of defendants Compton, McHugh, Neilson, Hammerschmidt, Kay, Fidelity, Local 98 and EMA on all claims against them.[7] An appropriate order follows.

■

circumstances [that] call for exception." *See DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 683 (4th Cir.1976); *Zubik v. Zubik*, 384 F.2d 267, 273 (3rd. Cir.1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968).

Under an alter ego analysis, "the appropriate occasion for disregarding the corporate existence occurs when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *American Bell Inc. v. Federation of Tel. Workers*, 736 F.2d 879, 886 (3rd Cir.1984) (quoting *Zubik, supra*, 384 F.2d at 272). In the case before me, recognition of the corporate structure of EMA would not perpetuate any "fraud, illegality or injustice": there are no claims of fraudulent conduct by the trustees and the transactions complained of, which arise from a mortgage loan that was not prohibited when originally made in 1972, would not be illegal if the corporate form of EMA is upheld.

At first glance, it appeared that it would be difficult to find that EMA is a party in interest to the Plan for purposes of the prohibitions of Section 406(a) under the rigorous test that the Third Circuit has adopted to pierce a corporate veil. Nonetheless, I questioned whether these rigorous standards were applicable in an ERISA case.

The United States Supreme Court has "consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies." *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 630, 103 S.Ct. 2591, 2602, 77 L.Ed.2d 46 (1983). "In determining whether to disregard the corporate form, we must consider the importance of the use of that form in the federal statutory scheme, [citation omitted], an inquiry that generally gives less deference to the corporate form than does the strict alter ego doctrine of state law." *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1220 (2nd Cir.1987). In the context of ERISA, great weight should not be attached to the corporate form: "[i]ndeed, deferring too readily to the corporate identity may run contrary to the explicit purposes of the Act ...". *Id.* at 1220.

Neither party cited, and I have not found, any case presenting the factual situation in this case where an entity relies upon its status as a separately incorporated entity to avoid being deemed a party in interest for purposes of the prohibitions against party in interest transactions under Section 406(a) of ERISA. Closely analogous, however, is a pre-*Mertens* decision that held that corporations (and their shareholders) could not rely on their separate incorporation to avoid liability for purposes of the prohibitions against self dealing by fiduciaries under Section 406(b) of ERISA.

In *Lowen, supra*, the Second Circuit affirmed the district court's decision to pierce the corporate veil of two corporations that were closely related to the corporate investment manager fiduciary of the plan in order to hold the individual shareholders of the corporations liable for "knowing participation" in fiduciary breaches. The Second Circuit, which treated the corporate and individual defendants as a single enterprise for the purposes of ERISA, stated that "[a] failure to disregard the corporate form in the circumstances of the present case would fatally undermine ERISA" to hold the named fiduciary, its closely related corporations and the individual shareholders of the related corporations jointly and severally liable for self-dealing with plan assets. *Id.* at 1221. *See also Confer v. Custom Eng. Co.*, 952 F.2d 34, 37 n. 4 (3rd Cir.1991) (citing *Lowen* with approval to state that, where a corporation is a fiduciary, misuse of the corporate form can lead to a finding of individual fiduciary liability on part of corporation's officers or to piercing the corporate veil).

The policy reasons for prohibiting the transfers of plan assets to a party in interest under section 406(a) are no less compelling reasons to pierce a corporate veil than the reasons underlying section 406(b) prohibitions on self-dealing between a plan and its named fiduciaries. The undisputed close financial relationship between Local 98 and the independently incorporated EMA raises the very concerns about the potential for "shell game maneuvers" to shift and avoid fiduciary duties and obligations that Congress intended to eliminate by prohibiting transactions between a plan and a party in interest. *See Lowen, supra*, 829 F.2d at 1221.

Nonetheless, *Lowen*, which held that all parties that knowingly participate in fiduciary breaches are liable to the same extent as fiduciaries, *id.* at 1220, is questionable authority after *Mertens*. I have restrained from applying its principles absent directives to the contrary from the appellate courts because I cannot find any authority in the statute to impose liability on defendants for causing the Plan to transact with a party that is admittedly not a party in interest.

7. My ruling today obviates the need for a discussion of the validity of the Secretary's claims against each named defendant. However, because *Mertens* has directed my adjudication of the threshold issue of this case, I will also address the impact of the dicta in that case stating that "it [was] unclear that there was a remediable wrong," *id.* —— U.S. at ——, 113 S.Ct. at 2067, on the Secretary's ability to maintain claims against the non-fiduciary defendants.

Compton, McHugh and Neilson were the union-designated trustees and members and Hammerschmidt and Kay were employer-designated trustees and members of the Joint Board of Trustees of the Plan on July 1, 1984 and on April 25, 1985. Each of these defendants was a fidu-

ciary to the Plan within the meaning of section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

Pursuant to section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), a person is a fiduciary with respect to a plan to the extent:

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

Fidelity claims that it was not a fiduciary to the Plan with respect to the contested mortgage loan and note because it had no discretionary authority over the asset and urges me to find that its role was limited to that of a "depository" for the mortgage note.

I am not persuaded by Fidelity's argument that section 5.4(b)(2) of the 1975 trust agreement appointing Fidelity as the Plan's corporate trustee required the trustees to expressly grant Fidelity exclusive control over particular assets and, therefore, precludes any determination that Fidelity was a fiduciary with respect to the note. That section simply states that the trustees "shall have the power and authority to appoint one or more investment managers ... who shall be responsible for the management, acquisition, disposition, investing and reinvesting of such of the assets of the Trust Fund as the Trustees shall specify."

The trust agreement also provides that "the term Corporate Trustee shall mean the bank, trust or insurance company or other financial institution selected by the Board of Trustees to act as custodian of the cash, securities, or other assets of the Trust Fund. In addition to acting as custodian, the Corporate Trustee shall assume such additional obligations as are agreed upon in the Corporate Trust Agreement, as well as such obligations as are imposed upon the corporate trustee by the Act." The 1980 amendment to the trust agreement granted the corporate trustee "exclusive authority and discretion in the investment of the Fund ...".

· Furthermore, the undisputed facts refute Fidelity's position that it was a mere "depository" with respect to this asset. Fidelity admits that its chief investment officer advised the November 20, 1984 meeting of the trustees that sale of the asset would be "imprudent." He then retracted this advice at the February 14, 1985 meeting by stating that his earlier comments did not anticipate that a purchaser for fair market value would be located. Fidelity reported the fair market value of the mortgage. It received a check for sale of the mortgage note, reprocessed the sale of the mortgage, and executed a mortgage satisfaction piece. On these facts, I would not allow Fidelity to insulate itself from potential liability with respect to the mortgage loan and sale of the note.

The statute is rife with explicit obligations and duties imposed upon these fiduciaries to the Plan. Section 404(a)(1)(A) of ERISA, 29 U.S.C. § 1104(a)(1)(A), imposes a duty of loyalty requiring plan fiduciaries to discharge their duties "solely in the interest of [plan] participants and beneficiaries" and for the exclusive purpose of providing plan benefits to participants and their beneficiaries and of defraying reasonable expenses of administration of the plan.

Sections 406(b)(1) and (2), 29 U.S.C. § 1106(b)(1) and (2), prohibit fiduciaries from self-dealing with the plan's assets in their own interest or on behalf of other parties whose interests are adverse to the interests of the plan. "This rule both assures protection of plan assets and provides notice to fiduciaries of their obligations. It protects beneficiaries by prohibiting transactions tainted by a conflict of interest and thus highly susceptible of self dealing. It gives notice to fiduciaries that they must either avoid the transactions described in Section 406(b) or cease serving in their capacities as fiduciaries, no matter how sincerely they may believe that such transactions will benefit the plan. Such protection of beneficiaries and notice to fiduciaries requires that Section 406(b) be broadly construed ... and that liability be imposed even where there is no 'taint of scandal, no hint of self-dealing, no trace of bad faith ...' ". *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1213 (2nd Cir.1987).

Section 409(a), 29 U.S.C. § 1109(a), creates statutory liability for breach of fiduciary duties to a plan. Pursuant to section 405(a)(1), 29 U.S.C. § 1105(a)(1), a fiduciary is also liable for the breaches of a co-fiduciary "if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach."

By comparison, the statute does not explicitly require a non-fiduciary to avoid knowing or unknowing participation in the breach of a fiduciary duty imposed by ERISA to warn against inferring causes of action under ERISA. *See Mertens* at ——, 113 S.Ct. at 2067.

An earlier decision in this case reported at *Dole v. Compton*, 753 F.Supp. 563 (E.D.Pa.1990) (Van Antwerpen), allowed the Secretary's claim against EMA for knowing participation in a fiduciary breach to survive a motion to dismiss. The Secretary claims that ruling survives *Mertens* as the "law of the case" because the Supreme Court's decision was limited to the narrower issue of remedies. I disagree. ERISA is not a cafeteria: It would be inconsistent to allow unauthorized claims against non-fiduciaries for "knowing participation" in fiduciary breaches when I have ruled today that strict construction of ERISA does not permit me to find a statutory violation that is not explicit in the statute.

Because there is no statutory authority to impose liability on non-fiduciaries, the Secretary could not maintain an action against Local 98 and EMA (or against Compton, McHugh and Neilson, who, in their non-fiduciary capacities as officers of Local 98, were also all parties in interest with respect to the Plan within the mean-

ORDER

AND NOW, this 21st day of July, 1993, upon consideration of the decision of the United States Supreme Court in *Mertens v. Hewitt Associates,* — U.S. ——, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), it is hereby ORDERED that my order dated February 11, 1993 denying the Secretary of Labor's motion for summary judgment is hereby vacated.

It is further ORDERED that, upon consideration of the Secretary's motion for summary judgment and defendants' responses thereto, the proposed findings of fact of each party and the responses thereto, the parties' proposed conclusions of law, and the *Mertens* decision and the parties' briefs regarding its impact on the instant case, summary judgment is denied as to the moving party and is granted in favor of the non-moving parties.

Accordingly, judgment is entered against plaintiff and in favor of defendants Fred Compton, Joseph McHugh, John Neilson, Frederick Hammerschmidt, Gersil N. Kay, Electrical Mechanics Association, Fidelity–Philadelphia Trust Company, and the International Brotherhood Of Electrical Workers, Local 98 as plaintiff cannot maintain this action on the undisputed facts as a matter of law.

ing of sections 3(14)(A) and (H) of ERISA, 29 U.S.C. § 1002(14)(A) and (H)) for any losses suffered by the Plan because of their alleged knowing participation in any fiduciary breaches.