

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-5-1995

# Secretary of Labor v Compton

Precedential or Non-Precedential:

Docket 93-2019

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Secretary of Labor v Compton" (1995). *1995 Decisions.* Paper 152.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/152

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 93-2019
_____

ROBERT B. REICH, Secretary of the
United States Department of Labor,
Appellant

v.

FRED COMPTON, JOSEPH McHUGH, JOHN NIELSEN,
FREDERICK HAMMERSCHMIDT, GERSIL N. KAY,
ELECTRICAL MECHANICS ASSOCIATION,
THE FIDELITY-PHILADELPHIA TRUST COMPANY, and
THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS, LOCAL UNION NO. 98,
Appellees

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 88-7920)

_____

Argued: August 11, 1994
Before:  BECKER, ALITO, and GIBSON*, Circuit Judges

(Opinion Filed:   June 5, l995)

_____

THOMAS S. WILLIAMSON, JR.
Solicitor of Labor

ALLEN H. FELDMAN
Associate Solicitor for Special Appellate
  and Supreme Court Litigation

_____

*Hon. John R. Gibson, United States Circuit Judge for the Eighth
Circuit, sitting by designation.

NATHANIEL I. SPILLER
Counsel for Appellate Litigation

ELLEN J. BEARD (Argued)
Attorney

UNITED STATES DEPARTMENT OF LABOR
Room N-2700
200 Constitution Avenue, N.W.
Washington, D.C.  20210

Attorneys for Appellant

MICHAEL KATZ, ESQ. (Argued)
MERANZE AND KATZ
Lewis Tower Building, 12th Floor
15th and Locust Streets
Philadelphia, PA 19102

SANDRA L. DUGGAN, ESQ.
N. MARLENE FLEMING, ESQ. (Argued)
BLACKBURN & MICHELMAN, P.C.
2207 Chestnut Street
Philadelphia, PA  19103

Attorneys for Appellees, Fred Compton, Joseph
 McHugh, and John Nielsen

RICHARD B. SIGMOND, ESQ.
RICHARD C. McNEILL, JR., ESQ. (Argued)
SAGOT, JENNINGS & SIGMOND
1172 Public Ledger Building
Philadelphia, PA  19106

Attorneys for Appellees, Electrical Mechanics Association
and International Brotherhood of Electrical
Workers, Local Union No. 98

LAURANCE E. BACCINI, ESQ. (Argued)
CAROL A. CANNERELLI-VAN POORTVLIET
Of Counsel:
WOLF, BLOCK, SCHORR and SOLIS-COHEN
Twelfth Floor Packard Building
Philadelphia, PA 19102

Attorneys for Appellees, Frederick Hammerschmidt,
Gersil N. Kay, and
The Fidelity-Philadelphia Trust Company

---

OPINION OF THE COURT

---

ALITO, <u>Circuit Judge</u>:

This is an appeal from an order granting summary judgment in favor of the defendants in an action brought by the Secretary of Labor ("the Secretary") to redress alleged violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. The action was based on certain financial transactions involving the International Brotherhood of Electrical Workers Union No. 98 Pension Plan ("the Plan") and the Electrical Mechanics Association ("EMA"), a not-for-profit corporation closely related to Local 98 of the International Brotherhood of Electrical Workers ("Local 98" or "the union"), whose members are covered by Plan. Maintaining that these transactions were prohibited because of EMA's close relationship with Local 98, the Secretary sued the Plan trustees, Local 98, and EMA. The district court granted summary judgment for the defendants, but we now reverse in part, affirm in part, and remand for further proceedings.

## I.

In 1972, the Plan made a 30-year loan of $800,000 to EMA at 7.5% interest. EMA used this loan to finance construction of a building, and the loan was secured by a mortgage on this property. The building constructed with the loan housed Local

98's offices. Two years after EMA obtained the loan, Congress passed ERISA. Section 406(a) of ERISA, 29 U.S.C. § 1106(a), prohibits various transactions involving a plan and a "party in interest." With respect to transactions that occurred before 1974, however, these prohibitions did not take effect until June 30, 1984. See 29 U.S.C. § 1114(c).

Concerned that its outstanding loan to EMA would be considered a prohibited transaction after that date, the Plan applied to the Department of Labor on April 30, 1984 for an exemption from this provision. See 29 U.S.C. § 1108 (authorizing the Secretary to grant exemptions from ERISA's prohibited transaction provisions). On June 1, 1984, the Department tentatively denied the exemption and advised the Plan that its only permissible options were to renegotiate the terms of the loan so that EMA was charged a market interest rate or to require EMA to satisfy the loan in full. Contrary to the advice of its counsel, the Plan withdrew its exemption request and, on April 25, 1985, accepted from EMA a payment of $380,289.93, the fair market value of the loan, in full satisfaction of the debt, which at the time had an accounting value of $653,817.47.[1] EMA borrowed the entire amount of this payment from Local 98. Local 98 then imposed a special "rental" assessment on its members and paid the proceeds to EMA. EMA in turn used those funds to repay the money advanced by the union. Joint Appendix ("JA") at 133.

---

[1]. The difference in value was due to the extraordinary increase in interest rates between 1972 and 1984.

During 1984 and 1985, Fred Compton, Joseph McHugh, and John Nielsen were Local 98's designated trustees ("union trustees") for the Plan; Frederick Hammerschmidt and Gersil Kay were the employer-designated trustees ("employer trustees"); and Fidelity-Philadelphia Trust Company ("Fidelity") was the Plan's corporate trustee. Compton was also president of both EMA and Local 98 from 1981 through 1987; McHugh was a member of Local 98's executive board from 1981 through 1987; and Nielsen was financial secretary of Local 98 from 1981 through 1987, as well as a member of EMA's board of directors from 1981 through June 1984.

In October 1988, the Secretary filed a complaint in district court against Compton, McHugh, Nielsen, Hammerschmidt, Kay, Fidelity, EMA, and Local 98 (collectively "the defendants"). The complaint first asserted that EMA "was a shell corporation wholly controlled by Local 98" and that therefore "all transactions with EMA, were, in fact, transactions with Local 98," which was a "party in interest" under section 3(14)(D) of ERISA, 29 U.S.C. § 1002(14)(D).[2] JA at 17-18. The complaint alleged that the loan to EMA became a prohibited transaction as of July 1, 1984, pursuant to sections 406(a)(1)(A), (B), and (D) of ERISA, 29 U.S.C. §§ 1106(a)(1)(A), (B), and (D).[3] Id. at 18. Likewise, the complaint alleged that EMA's subsequent purchase of its note was

_____

[2]. Section 3(14) of ERISA, 29 U.S.C. § 1002(14), is set out in the text infra at pages 15 to 16. The Secretary conceded that EMA was not a party in interest.

[3]. Section 406(a)(1) of ERISA, 29 U.S.C. § 1106(a)(1), is set out in the text, infra at page 12.

a prohibited transaction under these same provisions because the note was purchased for less than its principal value. Id. at 21.

Based on these transactions, the complaint claimed that various defendants had committed several different ERISA violations. First, the complaint claimed that from July 1, 1984 until August 25, 1984 (the date when EMA purchased the note), trustees Compton, McHugh, Nielsen, Hammerschmidt, and Kay had breached their fiduciary obligations under sections 404(a)(1)(A) and (B) of ERISA, 29 U.S.C. §§ 1104(a)(1)(A) and (B),[4] by failing to collect on the loan. Id. at 19. Second, the complaint claimed that Fidelity had likewise breached its fiduciary duties under sections 404(a)(1)(A), (B), and (D) of ERISA, 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D), by failing to take appropriate action to collect on the loan during this same period. Id. at 20. Third, the complaint alleged that all Plan trustees had breached their fiduciary obligations by causing the Plan to continue to hold the EMA loan during this same period even though they knew or should have known that doing so constituted a prohibited transaction under sections 406(a)(1)(B) and (D) of ERISA, 29 U.S.C. §§ 1106(a)(1)(B) and (D). Id. at 20-21. Fourth, the complaint charged that all the Plan trustees had breached their fiduciary obligations by causing the Plan to sell the note to EMA when they knew or should have known that this was a prohibited transaction under sections 406(a)(1)(A) and (D) of

_____

[4]. Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1), is set out in the text, infra at page 50.

ERISA, 29 U.S.C. §§ 1106(a)(1)(A) and (D).  Id. at 21.  Fifth, the complaint alleged that the union trustees had breached their duties to the Plan under sections 406(b)(1) and (2) of ERISA, 29 U.S.C. §§ 1106(b)(1) and (2)[5], by "dealing with the assets of the Plan in their own interest and for their own accounts, and in their individual capacity by acting in a transaction involving the Plan on behalf of a party (or representing a party) whose interests were adverse to those of the Plan" and its participants or beneficiaries.  Id. 21.  Finally, the complaint alleged that EMA and Local 98 had participated in the trustees' breaches of their fiduciary duties and, furthermore, that each Plan trustee was liable for the others' fiduciary breaches under sections 405(a)(2) and (3) and (b)(1)(A) of ERISA, 29 U.S.C. §§ 1105(a)(2) and (3) and (b)(1)(A).[6]  Id. at 21–22.

---

[5].  Section 406(b)(2) of ERISA, 29 U.S.C. § 1106(b)(2), is set out in the text, infra at page 43.

[6].  Sections 405(a)(2) and (3) of ERISA, 29 U.S.C. §§ 1105(a)(2) and (3), provide:

> (a) In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: . . .
>
> > (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he had enabled such other fiduciary to commit a breach; or
> >
> > (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

The complaint sought an injunction prohibiting the defendants from committing further ERISA violations.  Id. at 23.  It also sought an order requiring Local 98 and EMA to "restor[e] to the Plan the unpaid balance of the loan with interest" and an order requiring each defendant, jointly and severally, "to restore to the Plan all Plan losses attributable to their fiduciary breaches."  Id. at 23-24.

After discovery, the Secretary moved for summary judgment.  Much of the Secretary's argument rested on the contention that EMA was "a shell corporation or alter ego wholly controlled by Local 98."  Id. at 147.  The district court initially denied this motion in February 1993, but following the Supreme Court's decision in Mertens v. Hewitt Associates, 113 S. Ct. 2063 (1993), the district court requested the parties to submit briefs concerning the impact of that decision.  The court subsequently vacated its earlier order denying the Secretary's motion for summary judgment and instead entered summary judgment in favor of the non-moving defendants.  McLaughlin v. Compton, 834 F. Supp. 743, 751 (E.D. Pa. 1993) ("Compton I").  The court interpreted Mertens as a directive to "strictly construe" ERISA.  Id. at 747.

(..continued)

Section 405(b)(1)(A) of ERISA, 29 U.S.C. § 1105(b)(1)(A), provides:

> Except as otherwise provided in subsection (d) of this section and in section 1103(a)(1) and (2) of this title, if the assets of a plan are held by two or more trustees --
>
>> (A) each shall use reasonable care to prevent a co-trustee from committing a breach . . . .

Noting that EMA was not "a party in interest" under the applicable provision of ERISA, the district court reasoned that the Secretary's alter ego argument would expand the reach of this provision and thus contravene Mertens' teaching that liability can be imposed under ERISA only when the statute "explicitly prohibits the challenged transaction . . . ." Id.

The Secretary moved for reconsideration, arguing that "the literal text of ERISA" prohibited the transactions at issue in this case. JA at 343. Specifically, the Secretary contended that the challenged transactions constituted "indirect" transactions with Local 98, in violation of sections 406(a)(1)(A), (B), and (D) of ERISA, and that the transactions constituted the "use" of Plan assets "for the benefit" of Local 98, in violation of section 406(a)(1)(D) of ERISA. Id. at 348–49. In addition, the Secretary argued that, even if the court adhered to its previous ruling that the loan to EMA and its subsequent purchase were not prohibited transactions, the court would still have to decide: (a) whether all of the trustees had breached their fiduciary duties under section 404(a) of ERISA and (b) whether the union trustees had breached their fiduciary duties and violated sections 406(b)(1) and (2) of ERISA, as interpreted in Cutaiar v. Marshall, 590 F.2d 523 (3d Cir. 1979), when, in connection with EMA's purchase of the note for less than its accounting value, they allegedly "acted on both sides of the transaction in their joint capacities as Plan trustees, union officers, and EMA governing board members . . . ." Id. at 349–50.

The district court denied this motion. After observing that "it would be appropriate to deny the motion on purely procedural grounds" because it simply advanced additional arguments not raised in the Secretary's prior brief concerning Mertens, the court addressed the merits of the Secretary's argument. Reich v. Compton, 834 F. Supp. 753, 755-56 (E.D. Pa. 1993) ("Compton II"). Interpreting the Secretary's motion as arguing that the transactions in question were "indirect party in interest transactions," the court wrote that "ERISA does not contemplate transfers to `indirect parties in interest'--the transferee is either a party in interest under the statute or it is not." Id. at 756. The court also concluded that the transactions did not constitute a "direct" benefit to the union because "[n]o cash `benefits' or `plan assets' ever passed to Local 98." Id. Likewise, the court held that the questioned transactions did not constitute an "indirect benefit" to Local 98 because it paid rent to occupy the building constructed with the loan and because the union had no obligation to finance EMA's purchase of the note. Id.

Finally, the court rejected the argument that the union trustees violated sections 406(b)(1) and (2) of ERISA due to their participation in EMA's purchase of the note. Attempting to distinguish Cutaiar, supra, the court observed that "the boards of the Plan and EMA were not identical" and that the union trustees did not constitute a majority of or control EMA's board. Compton II, 834 F. Supp. at 757. The district court did not, however, address the Secretary's argument that the Plan trustees

had violated their fiduciary duties pursuant to section 404(a) of ERISA.  This appeal followed.


## II.  ERISA Section 406(a)(1) Claims Against Fiduciaries

A.  We first address whether the district court correctly entered summary judgment against the Secretary with respect to his claims that the Plan trustees violated sections 406(a)(1)(A), (B), and (D) of ERISA, 29 U.S.C. §§ 1106(a)(1)(A), (B), and (D).  Congress adopted section 406(a) of ERISA to prevent plans from engaging in certain types of transactions that had been used in the past to benefit other parties at the expense of the plans' participants and beneficiaries.  Before ERISA, plans could generally engage in transactions with related parties so long as the transactions were "arms-length."  Commissioner of Internal Revenue v. Keystone Consolidated Indus., 113 S. Ct. 2006, 2012 (1993).  Unfortunately, this rule was difficult to police and thus "provided an open door for abuses" by plan trustees. Id.

Congress accordingly enacted section 406(a) with the goal of creating a categorical bar to certain types of transactions that were regarded as likely to injure a plan.  Id.; S. Rep. No. 93-383, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 4890, 4981.  Section 406, which is entitled "Prohibited transactions," provides in pertinent part as follows:

> (a) Transactions between a plan and a party in interest
>
> Except as provided in section 1108 of this title:
>
> (1)  A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows

or should know that such transaction constitutes a direct or indirect--

> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> (B) lending of money or other extension of credit between the plan and a party in interest;
>
> (C) furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

In considering the Secretary's section 406(a)(1) claims against the Plan trustees, we will separate our inquiry into two parts. First, in part II.B. of this opinion, we will consider whether the transactions at issue in this case may be prohibited "indirect" transactions between the Plan and a "party in interest" (i.e., Local 98), in violation of section 406(a)(1)(A), (B), and (D). Second, we will consider, in part II.C. of this opinion, whether these transactions may constitute the use of Plan assets "for the benefit" of Local 98, in contravention of section 406(a)(1)(D).[7]

B. "Indirect" Transactions. Subsections (A), (B), and (D) of section 406(a)(1) of ERISA all reach certain direct and indirect transactions between a plan and a party in interest. Subsection (A) applies to the sale, exchange, or lease of

---

[7]. It is questionable whether the Secretary adequately raised this argument in district court prior to his motion for reconsideration, but since the district court denied the Secretary's motion for reconsideration on the merits, we also reach the merits of this argument.

property between a plan and a party in interest.  Subsection (B) applies to the lending of money or other extension of credit between a plan and a party in interest.  And subsection (D) reaches, among other transactions, the transfer of plan assets to a party in interest.  In this case, the Secretary argues that the Plan's loan to EMA and its subsequent sale of the underlying note to EMA were indirect transactions with Local 98 that violated these provisions.[8]  The Secretary argues that indirect transactions within the meaning of section 406(a)(1) include the following three categories:

> (1) multi-party transactions from a plan through one or more third-party intermediaries to a party in interest; (2) two-party transactions that are more complex than a simple sale, loan, or transfer of assets; and (3) transactions between a plan and the alter ego of a party in interest . . . .

Dept. of Labor 9/13/94 Letter-Brief at 2.[9]  The Secretary admits that the first two types of transactions are not involved here.[10]

---

[8]. Specifically, the Secretary asserts that the transactions constituted either an "indirect . . . sale or exchange . . . between a plan and a party in interest," in violation of section 406(a)(1)(A); an "indirect . . . lending of money between the plan and a party in interest," in violation of section 406(a)(1)(B), or an "indirect . . . transfer [of plan assets] to . . . a party in interest," in violation of section 406(a)(1)(D).

[9]. While the Secretary does not assert that this list is exhaustive, we limit our consideration in this appeal to the three categories that the Secretary has mentioned.

[10]. According to the Secretary, an example of the first type of transaction prohibited by section 406(a)(1) is a case in which a third party obtains a loan from a plan and then immediately turns over those funds to a party in interest.  As an example of the second type of transaction prohibited by section 406(a)(1), the Secretary points to Keystone Consolidated Indus., 113 S. Ct. at 2013 (1993).  There a party in interest transferred property to the plan in satisfaction of its funding obligations.  According

Thus, the question before us is whether, as the Secretary contends, a transaction between a plan and an alter ego of a party in interest is, necessarily, an indirect transaction between the plan and a party in interest.

In advancing this argument, the Secretary begins by maintaining that his interpretation of section 406(a)(1) is entitled to deference under the principles set out in <u>Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.</u>, 467 U.S. 837, 843-44 (1984).[11]  We hold, however, that the Secretary's alter ego argument is inconsistent with clear congressional intent, and we therefore refuse to accept it.  <u>See Brown v. Gardner</u>, 115 S. Ct. 552, 556 (1994); <u>Dole v. Steelworkers</u>, 494 U.S. 26, 42-43 (1990).

The categorical prohibitions contained in section 406(a)(1) are built upon the concept of a "party in interest," and section 3(14) of ERISA, 29 U.S.C. § 1002(14), provides a long and detailed definition of this concept.  Section 3(14) states:

> The term "party in interest" means, as to an employee benefit plan--

(..continued)
to the Secretary, this type of transaction can be conceptualized as a contribution of cash to the plan followed by the plan's purchase of the property with that cash.  We agree with the Secretary that neither of these two types of transactions is at issue here.

[11].  The Secretary's alter ego argument, however, does not appear to be embodied in any regulation or enforcement guideline. Moreover, it is not clear that the Secretary advanced this interpretation in any prior litigation.  In light of our conclusion that the alter ego theory is inconsistent with the relevant provisions of ERISA, we need not determine the degree of deference, if any, that would otherwise be warranted under these circumstances.  <u>See Martin v. OSHRC</u>, 499 U.S. 144, 156-57 (1991).

    (A) any fiduciary (including, but not limited
to, any administrator, officer, trustee, or
custodian), counsel, or employee of such employee
benefit plan;

    (B) a person providing services to such plan;

    (C) an employer any of whose employees are
covered by such plan;

    (D) an employee organization any of whose
members are covered by such plan;

    (E) an owner, direct or indirect, of 50 percent
or more of--

        (i) the combined voting power of all
    classes of stock entitled to vote or the
    total value of shares of all classes of stock
    of a corporation,

        (ii) the capital interest or the profits
    interest of a partnership, or

        (iii) the beneficial interest of a trust or
    unincorporated enterprise, which is an
    employer or an employee organization
    described in subparagraph (C) or (D);

    (F) a relative (as defined in paragraph (15) of
any individual described in subparagraph (A), (B),
(C), or (E);

    (G) a corporation, partnership, or trust or
estate of which (or in which) 50 percent or more
of --

        (i) the combined voting power of classes of
    stock entitled to vote or the total value of
    shares of all classes of stock of such
    corporation,

        (ii) the capital interest or profits
    interest of such partnership, or

        (iii) the beneficial interest of such trust
    or estate,

is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E);

(H)  an employee, officer, director (or individual having powers or responsibilities similar to those of officers or directors), or a 10 percent or more shareholder directly or indirectly, of a person described in subparagraph (B), (C), (D), (E), or (G), or of the employee benefit plan; or

(I)  a 10 percent or more (directly or directly in capital or profits) partner joint venturer of a person described in subparagraph (B), (C), (D), (E), or (G).

The Secretary, after consultation and coordination with the Secretary of Treasury, may by regulation prescribe a percentage lower than 50 percent for subparagraph (E) and (G) and lower than 10 percent for subparagraph (H) or (I).  The Secretary my prescribe regulations for determining the ownership (direct or indirect) of profits and beneficial interests, and the manner in which indirect stockholdings are taken into account. Any person who is a party in interest with respect to a plan to which a trust described in section 501(c)(22) of Title 26 is permitted to make payments under section 1403 of this title shall be treated as a party in interest with respect to such trust.

The Secretary's interpretation would in effect add an additional category, i.e., an alter ego of a party in interest, to this seemingly comprehensive list.  Moreover, this additional category would substantially overlap some of the categories specifically listed in this provision.  See, e.g., 29 U.S.C. §§ 1002(14) (E) and (G).  We therefore agree with the district court that the Secretary's interpretation would upset the carefully crafted and detailed legislative scheme reflected in section 3(14).  See Compton I, 834 F. Supp. at 746-47, 49.  See also Mertens, 113 S. Ct. at 2067; Massachusetts Mutual Life Ins. Co.

v. Russell, 473 U.S. 134, 146-47 (1988).  Congress could have easily provided in section 3(14) that an "alter ego" of a party in interest is also a party in interest, but Congress did not do so.  See Joslyn Mfg. Co. v. T.L. James & Co., 893 F.2d 80, 83 (5th Cir. 1990), cert. denied, 498 U.S. 1108 (1991).  As the Supreme Court stated in Mertens, 113 S. Ct. at 2071-72, ERISA is "an enormously detailed statute that resolved innumerable disputes between powerful competing interests," and courts should not "attempt to adjust the balance . . . Congress has struck."

The Secretary's interpretation appears to rest on the false premise that there is a uniform body of law that can be employed in all contexts for the purpose of determining whether one entity or person is another's alter ego.[12]  In reality, however, the term alter ego is simply shorthand for the conclusion that one party should be held liable in a particular context for the transgressions of another closely related party.  Consequently,

_____

[12].  Indeed, the Secretary cannot even claim that his interpretation is consistent with the common law of trusts upon which Congress engrafted ERISA.  See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989).  The Secretary can point to no body of trust law evidencing his proposed alter ego principles.  This is not surprising given that the alter ego doctrine originally developed in the context of corporate law. The common law of trusts did not include per se prohibitions against a trustee dealing with a related party, and certainly did not include per se prohibitions against a trustee dealing with an alter ego of a related party.  Instead, a trustee's sale of trust property to a related party could only be set aside if it were shown that the trustee was improperly influenced by the relationship and received an unfair price.  See Keystone Consolidated Indus., 113 S. Ct. at 2012; Restatement (Second) of Trust § 170 cmt. e (1957); 2A Austin W. Scott & William F. Fratcher, Law of Trusts § 170.6 (4th ed. 1987).

the principles governing alter ego liability vary depending on the legal context in which the determination takes place. For example, the factors supporting the imposition of alter ego liability in labor law differ from those employed in the corporate law setting. Compare Stardyne, Inc. v. NLRB, 41 F.3d 141, 151 (3d Cir. 1994) (explaining that, for the purposes of the National Labor Relations Act, factors relevant for determining whether two employers are alter egos include whether they share substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership) with Culberth v. Amosa Ltd., 898 F.3d 13, 14 (3d Cir. 1990) (explaining that at common law two companies will be considered alter egos of one another only "where the controlling corporation wholly ignored the separate status of the controlled corporation and controlled its affairs [so] that its separate existence was a mere sham"); see also Berkey v. Third Ave. Ry., 155 N.E. 58, 61 (1927) ("Dominion may be so complete, interference so obtrusive, that by the general rule of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice."). Thus, if alter ego analysis were to be required under sections 3(14) and 406(a)(1) of ERISA, the Secretary and the courts would have to decide, presumably based on their understanding of the "purpose" or "policy" underlying the relevant provisions of ERISA, under what circumstances a party related to a party in interest should be subjected to the same prohibitions as a party in interest. Congress itself, however, made this very determination when it

adopted the definition of a party in interest that is set out in section 3(14).

For these reasons, we cannot accept the Secretary's alter ego argument, and we conclude that section 406(a)(1)'s prohibitions against certain indirect transactions between a plan and a party in interest do not automatically prohibit transactions between a plan and an alter ego of a party in interest.  We emphasize the narrowness of our holding.  While we reject the Secretary's alter ego argument, we do not reach any other possible interpretations of the concept of an "indirect" transaction with a party in interest.

C.  <u>Use of Plan Assets for the Benefit of a Party in Interest</u>.  In addition to prohibiting the transfer of plan assets to a party in interest, section 406(a)(1)(D) also provides as follows:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes . . . a direct or indirect . . . use . . . <u>for the benefit</u> of a party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1)(D) (emphasis added).  As we read this language, it provides that a fiduciary breach occurs when the following five elements are satisfied:  (1) the person or entity is "[a] fiduciary with respect to [the] plan"; (2) the fiduciary "cause[s]" the plan to engage in the transaction at issue; (3) the transaction "use[s]" plan assets; (4) the transaction's use of the assets is "for the benefit of" a party in interest; and

(5) the fiduciary "knows or should know" that elements three and four are satisfied.

In this case, it is clear that summary judgment in favor of the defendants cannot be sustained based on elements one, two, or three. With respect to the first element, it is undisputed that defendants Compton, McHugh, Nielsen, Hammerschmidt, and Kay were "fiduciaries," and we think it is clear, as the district court held, that Fidelity was a "fiduciary" as well.[13] As for element

---

[13]. Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), provides that, subject to an exception that is not applicable here:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or property of such plan, or has authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. . . .

Fidelity claims that it was not a fiduciary because it had no discretionary authority over the Plan's assets and was only a "depository" for the mortgage note. However, Fidelity clearly had, at the least, "authority respecting the management" of the Plan's assets. The 1980 Amendment to the Plan's trust agreement granted Fidelity "exclusive authority and discretion in the investment of the Fund . . . ." JA at 342. The minutes from the meetings of the Plan's Board of Trustees reveal that Fidelity had control over the Plan's investments. Id. at 55, 63, 83, 92–93. Likewise, Fidelity's involvement in the sale of the note to EMA clearly indicates that it "render[ed] investment advice" to the Plan. Fidelity concedes that its chief investment officer initially advised the Plan trustees that the sale of this asset would be "imprudent." Id. at 83. Thus, we agree with the district court and conclude that Fidelity was a fiduciary with respect to the Plan. Compton I, 834 F. Supp. at 751 n.7. See Lowen v. Tower Asset Management, Inc., 829 F.2d 1209, 1219 (2d Cir. 1987) (finding discretionary investment manager to be an ERISA fiduciary).

two, if the summary judgment record does not establish that the defendants "cause[d]" the Plan to engage in the challenged transaction, the record surely does not require the contrary conclusion. And with respect to element three, there can be no reasonable dispute that the transactions involved the "use" of Plan assets. The critical elements for present purposes are therefore elements four and five.

Element four, as previously noted, requires that the challenged transaction must constitute the use of plan assets "for the benefit of" a party in interest. The defendants contend that this element requires proof of a subjective intent to benefit a party in interest, whereas the Secretary maintains that such subjective intent is not necessary. Rather, the Secretary argues, all that need be proven is that the fiduciary should have known that the transaction would result in a benefit to a party in interest that was more than "minimal, incidental, or fortuitous." Dept. of Labor 9/13/94 Letter-Brief at 12.

We conclude that element four requires proof of a subjective intent to benefit a party in interest. This interpretation is strongly supported, if not required, by the statutory phrase "for the benefit." In ordinary usage, if something is done "for the benefit of" x, it is done for the purpose of benefitting x. If something is not done for the purpose of benefitting x but has that unintended effect, it cannot be said that it was done "for the benefit of" x. (It would be self-contradictory if someone said: "I did that for the benefit of x, but I did not want to benefit him.").

In addition, if element four did not require a subjective intent to benefit a party in interest, section 406(a)(1)(D) would produce unreasonable consequences that we feel confident Congress could not have wanted.  See Commissioner v. Brown, 380 U.S. 563, 571 (1965).  If "for the benefit of" is read to mean "having the effect of benefitting," section 406(a)(1)(D) would appear to prohibit a fiduciary from causing a plan to engage in any transaction that he or she should know would result in any form or degree of benefit for any party in interest, even if the transaction would be highly advantageous for the plan and the benefit for the party in interest would be unintended, indirect, and slight.

Apparently recognizing this problem, the Secretary argues that the benefit to the party in interest must be more than "minimal, incidental, or fortuitous."  Section 406(a)(1), however, contains no language that even hints at such a requirement.  Moreover, this requirement lacks conceptual clarity.  The concept of a more than "minimal" benefit is nebulous, and although the Secretary insists that section 406(a)(1) does not require proof of a subjective intent, the terms "incidental" and "fortuitous" both suggest a subjective element.  "Incidental" means, among other things, "occurring without intention or calculation."  Webster's Third New International Dictionary 1143 (1971).  "Fortuitous" means, among other things, "occurring without deliberate intention."  Id. at 895.

We thus find strong support for a subjective intent requirement in the language of section 406(a)(1)(D), and finding no contrary evidence in the legislative history,[14] we conclude that element four requires proof of a subjective intent to benefit a party in interest.

Precisely who must be shown to have this intent is not entirely clear from the statutory language. Since the statutory language suggests that the transaction must be "for the benefit" of a party in interest, it appears that the subjective intent to benefit a party in interest must be harbored by one or more of those involved in the transaction. In this appeal, however, we will not attempt to go further and specify precisely which persons involved in a transaction must be shown to have this intent.

---

[14]. On the contrary, we also note that the legislative history includes two examples of transactions that are prohibited by section 406(a)(1)(D) and both involve transactions whose purpose was to benefit a party in interest. H.R. Conf. Rep. No. 93-1280, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 5075, 5089.

Several Department of Labor opinion letters on which the Secretary has relied also suggest that the "for benefit of" language requires proof of subjective intent. According to the Secretary, "[t]he common theme in those opinions is that a complex transaction will violate Section 406(a)(1)(D) if it is . . . part of an agreement, arrangement or understanding in which a fiduciary caused plan assets to be used in a manner designed to benefit a party in interest . . . ." Dept. of Labor 9/13/94 Letter-Brief at 14 (emphasis added) (citing ERISA Advisory Opinion No. 93-33A, 1993 ERISA LEXIS 33, at *5 (Dec. 16, 1993); No. 89-18A, 1989 ERISA LEXIS 17, at *6 (Aug. 13, 1989); No. 85-33A, 1985 ERISA LEXIS 11, at *9 (Oct. 1, 1985)).

Element five requires proof that the fiduciary in question either knew or reasonably should have known that the transaction constituted the use of plan assets "for the benefit" of a party in interest. Thus, element five does not require proof of the fiduciary's subjective intent.

Applying this understanding of elements four and five to the record in the case before us, we hold that summary judgment was not properly granted in favor of the defendants on the basis that the two transactions did not violate Section 406(a)(1)(D) of ERISA. Based on the record, a reasonable factfinder could conclude that all of those involved in the two challenged transactions subjectively intended to benefit Local 98. There is some direct evidence of such an intent: trustee Compton stated that the Plan trustees refused to sue EMA to recover the balance of the loan because "if [they] filed suit against [EMA] [they] would be really filing suit against members of the union . . . ." JA at 467. Furthermore, there was strong circumstantial evidence of an intent to benefit the Union. A reasonable factfinder could easily find that the two transactions had the effect of benefitting the Union, and a reasonable factfinder could infer that the trustees intended to bring about this effect.

Although the district court, in denying the Secretary's motion for reconsideration, suggested that the Union did not benefit from the loan to EMA because the Union paid rent to EMA, we believe that a factfinder could reasonably come to a contrary

conclusion.[15]  There was no formal lease agreement between EMA

and Local 98, and EMA admitted that it was not trying to make any

money from the lease.  Compton II, 834 F. Supp. at 749 n.6.

Furthermore, Local 98 paid rent only when EMA exhausted its cash

on hand.  Id.  Thus, the "rent" that Local 98 was charged was

_____

[15].  The district court's apparent conclusion that Local 98 did
not benefit from these transactions is puzzling given that it
found the following facts to be undisputed:

> As of June 30, 1984, EMA owed Local 98 $230, 290.00.
> This debt consisted primarily of salary expenses that
> [the Union] paid to one or more of its employees who
> performed maintenance work at the 1719-29 Spring Garden
> Street building.  Of this amount, Local 98 charged EMA
> $17,293.00 in maintenance salary expenses during the
> year ending June 30, 1984.  The arrangement between
> Local 98 and EMA (which began prior to 1984) provided
> that EMA would not pay Local 98 the debt, which would
> be added to the intercompany payable account.  Local 98
> never demanded payment of the debt because it viewed
> transactions between itself and EMA as related party
> transactions. The reason the amount of intercompany
> payables to EMA and intercompany receivables to Local
> 98 carried on the financial books "grow[s] each year is
> because the amount that's charged to salary expenses,
> just was never paid by EMA to Local 98, so it's a
> liability account that just keeps increasing each year
> because no payments are ever made, or if they are made,
> they're very minor."  Salary and other expenses by
> Local 98 for EMA continued to accumulate over the
> years.  For example, "[a]s of June 30, 1987, EMA owed
> Local 98 $316,328.00 consisting primarily of salary and
> other expenses paid by Local 98 for EMA" that had
> accumulated over the years.  During the year ending
> December 31, 1988, EMA owed Local 98 $559,918.00.
> According to EMA's accountant, the debt was forgiven by
> Local 98.  Local 98 and EMA had an established practice
> of not signing loan documents to record their financial
> transactions; Local 98's policy is to not charge EMA
> interests on advances and transfers.

Compton I, 834 F. Supp. at 749 n.6.

only the amount necessary to cover EMA's financial obligations, and the record is clear that Local 98 historically treated EMA's obligations as its own.  Local 98 consistently forwarded EMA money to cover salary and operating expenses during this time period and forgave repayment of these obligations.  Id.  Nor was EMA charged interest on these loans.  Id.  Indeed, as noted, Local 98 provided EMA with the funds necessary to purchase the note held by the Plan.  Id.  Thus, a reasonable factfinder could conclude that Local 98 benefitted from the continuation of EMA's long-term below market mortgage loan because that loan reduced EMA's cash outflow, an outflow for which the union took responsibility.  Likewise, a reasonable factfinder could conclude that Local 98 was functionally responsible for EMA's debt and that, Local 98 therefore benefitted from the repurchase of the note for less than its accounting value.

Thus, we hold that the district court should not have granted summary judgment in favor of the defendants on the basis that the two challenged transactions were not prohibited transactions within the meaning of section 406(a)(1)(D).  On remand, the district court will need to resolve the two disputed elements of the Secretary's section 406(a)(1)(D) claim:  whether a party to the transactions had the subjective intent to benefit a party in interest and whether any of the trustees knew of or should have known that the transactions were intended for the benefit of a party in interest.

## III.  ERISA Section 502(a)(5) Claims

In this section, we consider the Secretary's claims against the nonfiduciary defendants (EMA and Local 98) pursuant to section 502(a)(5) of ERISA, 29 U.S.C. § 1132(a)(5).  The Secretary advances two separate theories: first, that section 502(a)(5) authorizes him to sue nonfiduciaries who knowingly participate in breaches of fiduciary duty by fiduciaries[16] and, second, that section 502(a)(5) authorizes him to sue nonfiduciaries who participate in transactions prohibited by section 406(a)(1).  We reject the first theory but accept the latter.

> A.  Section 502(a) of ERISA provides as follows:
>  A civil action may be brought--
>
>> (1) by a participant or beneficiary--
>>
>>> (A) for the relief provided in subsection (c) of this section, or
>>>
>>> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

---

[16].  Several ERISA provisions impose a duty on plan fiduciaries. As previously discussed, section 406(a)(1), 29 U.S.C. § 1106(a)(1), prohibits fiduciaries from causing the plan to engage in certain prohibited transactions.  Likewise, section 406(b) of ERISA, 29 U.S.C. § 1106(b), prohibits self-dealing by fiduciaries.  Section 404(a)(1), 29 U.S.C. § 1104(a)(1), imposes a duty of loyalty and prudence on fiduciaries.  In addition, section 409 of ERISA, 29 U.S.C. § 1109, imposes liability for any person who breaches a fiduciary duty.  As discussed below, the Secretary alleges that EMA and Local 98 were knowing participants in the Plan trustees' breach of these duties and therefore that EMA and Local 98 are liable under section 502(a)(5).  Of course, in order to hold EMA and Local 98 liable under this theory, the Secretary would first need to prove a breach of duty by a fiduciary.

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provisions of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter;

(4) by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title;

(5) except as otherwise provided in subsection (b) of this section, by the Secretary (A) to enjoin any act or practice which violates any provisions of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter; or

(6) by the Secretary to collect any civil penalty under subsection (c)(2) or (i) or (l) of this section.

Although the Supreme Court has not directly discussed the scope of section 502(a)(5), its discussion of section 502(a)(3) in Mertens provides considerable guidance due to the close relationship between those two provisions. In Mertens, former employees of the Kaiser Steel Corporation ("Kaiser") who participated in Kaiser's pension plan sued the plan's actuary in addition to the plan's trustees. 113 S. Ct. at 2065. Claiming that the services provided by the actuary to the pension plan had been deficient and had caused the plan to be inadequately funded, the pensioners sought to hold the actuary liable for the "all the losses that their plan sustained as a result of the alleged breach of fiduciary duties" by the plan's trustees. Id. at 2068.

The pensioners conceded that the actuary was not a fiduciary within the meaning of ERISA.  Id. at 2067.  However, relying on section 502(a)(3) of ERISA, which allows plan participants to "obtain other appropriate equitable relief to redress" violations of ERISA, the pensioners nevertheless maintained that the actuary could be held liable for his "knowing participation in the breach of fiduciary duty by the Kaiser plan's fiduciaries."  Id.

Although the only issue squarely before the Supreme Court in Mertens was whether the remedy sought by the pensioners constituted "appropriate equitable relief" as opposed to money damages, the Court's opinion discussed the antecedent question of whether section 502(a)(3) creates a cause of action against nonfiduciaries for knowing participation in a fiduciary's breach of fiduciary duty.  Id. at 2067.  The Court stated:

> [N]o provision explicitly requires [nonfiduciaries] to avoid participation (knowing or unknowing) in a fiduciary's breach of fiduciary duty.  It is unlikely, moreover, that this was an oversight, since ERISA does explicitly impose "knowing participation" liability on cofiduciaries.  See section 405(a), 29 U.S.C. § 1105(a).  That limitation appears all the more deliberate in light of the fact that "knowing participation" liability on the part of both cotrustees and third persons was well established under the common law of trusts.  In Russell we emphasized our unwillingness to infer causes of action in the ERISA context, since that statute's carefully crafted and detailed enforcement scheme provides "strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly."

Id. (quoting Russell, 473 U.S. at 146-47) (citations omitted) (emphasis in original).  Thus, the Court expressed considerable

doubt that section 502(a)(3) authorizes suits against nonfiduciaries who participate in fiduciary breaches.

Relying on this discussion, EMA and Local 98 argue that the Secretary cannot proceed against them on the theory that they knowingly participated in a fiduciary's breach. On the other hand, the Secretary urges that we disregard Mertens' discussion of this issue as "mere dicta." The Secretary contends that the language of section 502(a)(5) does not require that the ERISA violation be committed by the person against whom relief is sought. Rather, the Secretary argues that he may maintain a cause of action under section 502(a)(5) so long as the relief sought is "appropriate" for the purpose of "redressing" a violation. Thus, the Secretary asserts that he does not have to show that EMA and Local 98 actually violated any ERISA provision, but only that they were "knowing participants" in a fiduciary's violation and that the relief sought is appropriate for redressing that violation. The Secretary further contends that any ambiguity should be resolved in his favor since pre-Mertens case law generally recognized ERISA claims against nonfiduciaries who participated in a fiduciary's breach.[17] In the event that we

---

[17]. See Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 279-81 (2d Cir. 1992); Whitfield v. Lindermann, 853 F.2d 1298, 1302-03 (5th Cir. 1988), cert. denied, 450 U.S. 1089 (1989); Brock v. Hendershott, 840 F.2d 339, 342 (6th Cir. 1982); Thornton v. Evans, 692 F.2d 1064, 1078 (7th Cir. 1982); Fink v. National Sav. and Trust Co., 772 F.2d 951, 958 (D.C.Cir. 1985) (dicta). Cf. Mertens v. Hewitt Assocs., 948 F.2d 607, 611 (9th Cir. 1991), aff'd on other grounds, 113 S. Ct. 2063 (1993) (rejecting "knowing participation" liability); Useden v. Acker, 947 F.2d 1563, 1581 (11th Cir.), cert. denied, 113 S. Ct. 2927 (1993) (same).

do not interpret the language of section 502(a)(5) as creating such a cause of action against nonfiduciaries, the Secretary urges us to recognize such a cause of action by utilizing our authority to develop federal common law. The Secretary points out that the Supreme Court has authorized the federal courts to develop federal common law under ERISA by drawing on the traditional law of trusts, see Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 110 (1984), and the Secretary notes that the common law of trusts imposes liability on nonfiduciaries who knowingly participate in a fiduciary's breach of duty, see 3 Austin W. Scott & William F. Fratcher, Law of Trusts § 224.1, at 404 (4th ed. 1988).

The Secretary's argument has been rejected by the courts of appeals that have addressed it after Mertens. In Reich v. Rowe, 20 F.3d 25 (1st Cir. 1994), the Secretary sued several corporate defendants involved in the failed OMNI Medical Health and Welfare Trust. Id. at 26. OMNI provided group medical, dental, and life insurance to business employers in Massachusetts. Id. The Secretary contended that OMNI's fiduciaries breached their duties and that OMNI's financial consultants "knowingly participated" in this breach. Id. at 26-27. The district court dismissed the Secretary's claim against the financial consultants under Fed. R. Civ. P. 12(b)(6), id. at 28, and the First Circuit affirmed, id. at 35.

Despite the Secretary's urgings, the Rowe court found the Supreme Court's Mertens dicta to be persuasive. Id. at 30-31. Interpreting section 502(a)(5) "to authorize actions only against

those who commit violations of ERISA or who are engaged in an `act or practice' proscribed by the statute," id. at 29, the Rowe court concluded that this provision does not apply to a nonfiduciary's participation in a fiduciary breach because such participation "is not an `act or practice' which violates ERISA," id. at 30. The court further rejected the Secretary's argument that it should apply the court's broad equitable power and the court's federal common law-making authority under ERISA to read section 502(a)(5) expansively to reach such conduct. The court noted that "Congress had enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement," id. at 31-32 (quoting Russell, 473 U.S. at 147), and that it could have easily provided for a claim based on knowing participation in a fiduciary breach, id. at 31. The court wrote:

> All things considered, judicial remedies for nonfiduciary participation in a fiduciary breach fall within the line of cases where Congress deliberately omitted a potential cause of action rather than the cases where Congress has invited the courts to engage in interstitial lawmaking.

Id. at 31. Thus, the court concluded that the Secretary could not sue "a professional service provider [that] assist[ed] in a fiduciary breach but receive[d] no ill-gotten plan assets . . . ." Id. at 35.

Similarly, in Reich v. Continental Casualty Co., 33 F.3d 754, 757 (7th Cir. 1994), cert. denied, 115 S. Ct. 1104 (1995), the Seventh Circuit rejected the Secretary's argument that a nonfiduciary may be held liable for knowingly participating in a

fiduciary breach.  The court followed the _Mertens_ dicta, stating

that when the Supreme Court's view of an issue is embodied in
     a recent dictum that considers all the relevant
     considerations and adumbrates an unmistakable
     conclusion, it would be reckless to think the Court
     likely to adopt a contrary view in the near future.  In
     such a case the dictum provides the best, though not an
     infallible, guide to what the law is, and it will
     ordinarily be the duty of a lower court to be guided by
     it.

_Id._[18]

     In light of the Supreme Court's discussion in _Mertens_ and

subsequent decisions of the First and Seventh Circuits, we reject

the Secretary's argument that he may sue a nonfiduciary under

section 502(a)(5) for knowingly participating in a fiduciary

breach.  Contrary to the Secretary's urging, we are not prepared

to disregard the Supreme Court's discussion of this issue in

_Mertens_.  Moreover, we see little significance in the fact that

the Supreme Court in _Mertens_ was discussing section 502(a)(3) as

opposed section 502(a)(5).  As the Court noted in _Mertens_, the

----

[18].  _Buckley Dement, Inc. v. Travellers Plan Administrators of Illinois, Inc._, 39 F.3d 784 (7th Cir. 1994) is also instructive. There, the sponsor of a health care plan who was also its administrator and fiduciary sued a third-party claims administrator.  _Id._ at 785-86.  The sponsor argued that the administrator caused the plan to incur huge losses by failing to process a participant's medical claims before the plan's excess health insurance coverage policy lapsed.  _Id._  Because the administrator was not a fiduciary, the sponsor asked the court to infer a federal common-law right to relief under ERISA.  _Id._ at 789.  Relying on _Mertens_' dicta, the court declined to do so, holding that it was "without authority to entertain a claim for relief against a nonfiduciary based on [the] fashioning of a federal common-law remedy."  _Id._ at 790.  _Accord_, _Colleton Regional Hosp. v. MPS Medical Review Sys., Inc._, 866 F. Supp. 896 (D.S.C. 1994).

language shared by both provisions "should be deemed to have the same meaning," 113 S. Ct. at 2070, and we therefore believe that the analysis of the one provision should apply equally to the other with respect to the question at issue.  We therefore hold that section 502(a)(5) does not authorize suits by the Secretary against nonfiduciaries charged solely with participating in a fiduciary breach.[19]

---

[19]. The Secretary makes the additional argument that section 502(l) of ERISA, 29 U.S.C. § 1132(l), indicates that Congress intended for section 502(a)(5) to provide a remedy against nonfiduciaries who participate in a fiduciary breach.  Section 502(l) provides in relevant part:

> (1) in the case of--
>
>> (A) any breach of fiduciary responsibility under (or other violation of) part 4 by a fiduciary , or
>>
>> (B) any knowing participation in such a breach or violation by any other persons,
>
> the Secretary shall assess a civil penalty against such a fiduciary or other person in an amount equal to 20 percent of the applicable recovery amount . . . .

The Secretary contends that unless section 502(a)(5) provides a remedy for nonfiduciary violations of a fiduciary breach, the term "other persons" in section 502(l) would be rendered a nullity.  We disagree.

A similar contention was advanced in Mertens.  There, it was argued that section 502(l) demonstrated Congress intended to authorize the recovery of money damages for nonfiduciary participation in a fiduciary breach.  The Supreme Court, however, rejected this argument, explaining:

> [T]he "equitable relief" awardable under section 502(a)(5) includes restitution of ill-gotten plan assets or profits, providing an "applicable recovery amount' to use to calculate the penalty, . . . and even assuming nonfiduciaries are not liable at all for knowing participation in a fiduciary's breach of duty, see supra, at 2067-2068, cofiduciaries expressly are,

B.  We now turn to the Secretary's argument that section 502(a)(5) authorizes him to sue a nonfiduciary who participates in a transaction prohibited by section 406(a)(1).  In response to this argument, EMA and Local 98 seem to suggest that the Secretary cannot obtain relief from them even if the transactions at issue are found to be prohibited under section 406(a)(1) of ERISA.[20]  Section 406(a)(1) provides that "[a] fiduciary with

(..continued)
    see section 405, so there are some "other person[s]" than fiduciaries-in-breach liable under section 502(l)(1)(B).

113 S. Ct. at 2071.

        We also agree with the discussion of this argument in Rowe.  The Rowe court noted that Secretary was relying on a provision that provides civil penalties in order to infer a cause of action from a provision that only provides equitable relief. 20 F.3d at 34.  Thus, the court explained:

    [I]t is difficult to imagine any case where knowing participation in a fiduciary breach by a nonfiduciary would occasion the type of remedy (restitution awards) that would trigger [section 502(l)(1)(B)] without the nonfiduciary having engaged in a prohibited transaction under [section 406] or otherwise having obtained some ill-gotten plan assets in a manner not covered by the prohibited transaction section.  We conclude, therefore, that [section 502(l)] makes little sense as independently authorizing equitable relief against nonfiduciaries . . . who allegedly participated in a fiduciary breach but did not engage in an act prohibited by the statute or otherwise obtain plan assets, when it can never be used for such relief.

Id. at 34-35 (footnote omitted).

[20].  This argument is not available to the Plan trustees as they are all fiduciaries within the meaning of ERISA.  As noted, ERISA imposes a number of substantive duties on plan fiduciaries, see supra note 16, and sections 502(a)(3) and (5) of ERISA, 29 U.S.C. §§ 1132(a)(3) and (5), clearly authorize the Secretary to obtain relief against fiduciaries who have breached their duties.  Thus, the Secretary can sue any fiduciary who breached its duty because

respect to a plan <u>shall not cause</u> the plan to engage in a [prohibited] transaction . . . ." 29 U.S.C. § 1106(a)(1) (emphasis added). Since this language appears on its face to apply only to fiduciaries and not to other parties who participate in prohibited transactions, EMA and Local 98 maintain that the Secretary is attempting to make them liable for a fiduciary's breach of duty and that such a theory was rejected in <u>Mertens</u>.

While this argument is not without force, we are ultimately persuaded that it is based on an unduly narrow interpretation of sections 406(a)(1) and 502 (a)(5). First, we note that <u>Mertens</u> itself seemed to imply that section 406(a) imposes duties on nonfiduciaries who participate in prohibited transactions. After observing that "ERISA contains various provisions that can be read as imposing obligations upon nonfiduciaries," 113 S. Ct. at 2067, the Court cited section 406(a), 29 U.S.C. § 1106(a), as an example and stated that this provision prohibits a nonfiduciary party in interest from "offer[ing] his services" to a plan or "engag[ing] in certain other transactions with the plan," <u>id.</u> at 2067 n.4.

Second, the legislative history of ERISA appears to contradict the position advocated by EMA and Local 98. The Senate Report stated:

> The bill also makes a party in interest who participates in a prohibited transaction . . . personally liable for any losses sustained by the plan

(..continued)
of its participation in a prohibited transaction (or who breached any other duty).

and for any profits made through using plan assets. . . . This liability is appropriate because in these situations often the party in interest is a major beneficiary of a fiduciary breach . . . .

S. Rep. No. 93-383, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.A.A.N. 4890, 4989.

Third, EMA's and Local 98's position is inconsistent with the analysis of two other courts of appeals. In Rowe, the First Circuit, while refusing to accept the argument that the Secretary could sue a nonfiduciary under section 502(a)(5) for knowingly participating in a frivolous breach, suggested that the Secretary could maintain a suit under that provision against a party in interest who participated in a transaction prohibited under section 406(a)(1). The court observed:

Congress proscribed several "acts or practices" in ERISA's substantive provisions that involve nonfiduciaries . . . . See Mertens, ____ U.S. at ____ & n.4, 113 S. Ct. at 2067 & n.4. For example, 29 U.S.C. § 1106(a)(1) prohibits certain transactions between "parties in interest," see supra, note 2, and ERISA plans . . . .

20 F.3d at 31 (footnote omitted). The court then added:

The fact that [section 406] imposes the duty to refrain from prohibited transactions on fiduciaries and not on the parties in interest is irrelevant for our purposes because [section 502(a)(5)] reaches "acts or practices" that violate ERISA and prohibited transactions violate [section 406]. Although fiduciary breaches also violate ERISA, nonfiduciaries cannot, by definition, engage in the act or practice breaching a fiduciary duty. Nonfiduciaries can, however, engage in the act or practice of transacting with an ERISA plan.

Id. at 31, n.7.

Similarly, in Nieto v. Ecker, 845 F.2d 868 (9th Cir. 1988), the court held that a suit seeking appropriate equitable relief could be brought under section 502(a)(3)[21] against a party in interest who had participated in a transaction prohibited under section 406(a).  The court explained:

> It is true that section 406(a) only prohibits certain transactions by fiduciaries, and does not expressly bar parties in interest from engaging in these transactions.  However, section 502(a)(3)'s language expressly grants equitable power to redress violations of ERISA; prohibited transactions plainly fall within this category.  Courts may find it difficult or impossible to undo such illegal transactions unless they have jurisdiction over all parties who allegedly participated in them.  In contrast to section 409(a), section 502(a)(3) is not limited to fiduciaries, and there is no reason to exempt parties in interest from this remedial provision when the engage in transactions prohibited by [ERISA].

Id. at 873–74.[22]

_____

[21].  Nieto involved the construction of section 502(a)(3). However, as explained above, see supra page 34, we see no reason to distinguish between section 502(a)(3) and 502(a)(5) on this issue.

[22].  In light of this analysis, EMA's and Local 98's reliance on Brock v. Citizens Bank of Clovis, 841 F.2d 344 (10th Cir.), cert. denied, 488 U.S. 829 (1988), is misplaced.  In Citizens Bank, the Secretary brought a suit against an ERISA trustee for violating section 406(a)(1).  841 F.2d at 345–46.  The ERISA trustee, a bank, had loaned plan funds to individuals who had used the money to pay off interim financing that they had received from the bank.  Id.  The Secretary did not allege that this transaction violated a specific provision of ERISA but argued that ERISA demanded "a strict prohibition of any dealing in which doubt may be cast upon the loyalty of the fiduciary."  Id. at 347.  Because the Secretary was unable to allege the violation of a specific provision of ERISA, the Tenth Circuit upheld the dismissal of his claim.  Id.  The present case, however, is clearly distinguishable because here the Secretary has alleged that EMA and Local 98 violated a specific substantive provision of ERISA, section 406(a)(1), that regulates the conduct of nonfiduciaries.

Fourth, we agree with the Secretary that the parallel tax provisions support his position that nonfiduciaries may be held liable for their participation in prohibited transactions. Section 4975 of the Internal Revenue Code, 26 U.S.C. § 4975, imposes taxes on certain persons who participate in prohibited transactions. Section 4975(h) provides that the Secretary of Treasury is required to notify the Secretary of Labor before sending a notice of deficiency with respect to such taxes in order to give the latter a "reasonable opportunity to obtain a correction of the prohibited transaction . . . ." Since "correction of the prohibited transaction" implies an order of restitution directed to the party who participated in the transaction with the plan, this provision buttresses the Secretary's position. For all of these reasons, we hold that the Secretary can bring an action under section 502(a)(5) against a nonfiduciary who participates in a transaction prohibited by section 406(a).[23]

---

[23]. Contrary to EMA's suggestions, this holding is not foreclosed by footnote six of our opinion in Painters of Philadelphia Council No. 32 Welfare Fund v. Price Waterhouse, 879 F.2d 1146 (3d Cir. 1989). In that case, a plan and its trustees sued the plan's former auditor under section 502(a)(3) of ERISA, claiming that the auditor breached its fiduciary duties by failing to advise the trustees about improprieties allegedly committed by the plan's administrator, and that the auditor was therefore liable for the resulting losses under section 409 of ERISA, 29 U.S.C. § 1109, which makes a fiduciary liable for the losses caused by a fiduciary breach. Id. at 1148-49. We upheld the dismissal of these claims. Id. at 1151. After explaining that the auditor was not a fiduciary under ERISA, we responded in footnote six to the plaintiffs' suggestion that they could sue the auditor under section 502(a)(3) even if it was not a fiduciary. We noted the plaintiff's reliance on Justice Brennan's concurrence in Russell, where it was suggested that the

Finally, we disagree with EMA's contention that even if section 406(a)(1) regulates the behavior of some nonfiduciaries, it does not reach nonfiduciaries that are not parties in interest. As we previously explained, see supra pages 19 to 27, section 406(a)(1)(D) applies to transactions between a plan and a third party when the transaction is "for the benefit of a party in interest." Section 406(a)(1)(D) therefore extends the scope of liability under ERISA beyond fiduciaries and parties in interest. Because section 502(a)(5) authorizes the Secretary to obtain relief against any party that participates in a transaction that violates section 406(a)(1), EMA can be held liable for its role in the allegedly prohibited transaction.

We will, however, uphold the district court's award of summary judgment in favor of EMA and Local 98 as to the first, but not the second, transaction. The liability of EMA and Local 98 as to the first transaction is predicated on the Plan trustees' holding of the note past the expiration of the grandfather period. We know of no way, and the Secretary has not suggested one, that EMA and Local 98 could have forced the Plan

(..continued)
phrase "other appropriate equitable relief" in section 502(a)(3) might be read to incorporate principles of trust law under which a beneficiary might obtain extracontractual damages based on a fiduciary breach. See 473 U.S. at 150, 157-58. We then wrote: "Since we have held that [the auditor] is not a fiduciary under ERISA, however, it cannot be held liable on a trust-law theory." 879 F.2d at 151 n.6. Although EMA construes this statement to mean flatly that "a . . . section 502(a)(3) action for equitable relief against nonfiduciaries cannot be maintained," EMA Br. at 21, we interpret this statement to mean only that principles of trust law permitting the recovery of extracontractual damages from a fiduciary who breaches his or her duties provide no basis for recovery from a nonfiduciary.

to divest itself of the note in a timely fashion. We also note that ERISA had not been enacted at the time of the first transaction. Thus, we conclude that EMA and Local 98 did not engage in an "act or practice" prohibited by ERISA and therefore they cannot be held liable by the Secretary pursuant to section 502(a)(5). On the other hand, EMA and Local 98 were clearly active parties in the second transaction and therefore the Secretary has a cause of action against them on this transaction.

In sum, we hold that a nonfiduciary that is a party to a transaction prohibited by section 406(a)(1) engages in an "act or practice" that violates ERISA. We furthermore hold that the Secretary, pursuant to section 502(a)(5), may sue to enjoin this act or practice or "to obtain other appropriate equitable relief to redress such a violation." On remand, therefore, the Secretary may maintain his section 406(a)(1)(D) claims against EMA and Local 98 as to the second transaction.[24] We uphold the district court's award of summary judgment as to the first transaction because neither EMA nor Local 98 controlled the decision to hold the note past the grandfather period and therefore they did not engage in an action or practice that violated ERISA.

## IV.  Section 406(b)(2) Claim

---

[24]. The defendants also claim that the Secretary is not entitled to the relief sought for the alleged violations of section 406(a)(1)(D) because it is not "appropriate equitable relief." This issue was not presented to or decided by the district court, and we decline to address it now.

We next address whether the district court erred in ruling that the union trustees, Compton, McHugh and Nielsen, did not violate section 406(b)(2) of ERISA, 21 U.S.C. § 1106(b)(2).[25] The Secretary argues that these trustees violated section 406(b)(2) because, in connection with the sale of the note to EMA, they "participated actively in the decisionmaking process regarding the disposition of the mortgage loan on behalf of both the lender, the plan, and the borrowers, EMA and Local 98." Dept. of Labor Br. at 40. We hold that the district court erred in granting summary judgment against the Secretary with respect to this claim.

Section 406(b) prohibits a plan fiduciary from engaging in various forms of self-dealing. Its purpose is to "prevent[] a fiduciary from being put in a position where he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries." H.R. Conf. Rep. No. 93-1280, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5089.

Section 406(b)(2) provides in pertinent part:
 A fiduciary with respect to a plan shall not-- . . .

> (2) in his individual or any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries . . . .

---

[25]. Before the district court, the Secretary also argued that the union trustees violated section 406(b)(1). The Secretary has abandoned this claim.

This provision is a blanket prohibition against a fiduciary's "act[ing] on behalf of" or "represent[ing]" a party with interests "adverse to the interests of the plan" in relation to a transaction with the plan.  Thus, this provision, like the prohibited transaction provisions of section 406(a)(1), applies regardless of whether the transaction is "fair" to the plan.

In Cutaiar v. Marshall, 590 F.2d 523 (3d Cir. 1979), we addressed the scope of section 406(b)(2).  In that case, an identical group of trustees managed a union pension fund and a union welfare fund.  Id. at 525.  Because of decreased employer contributions, the welfare fund began to run short of cash, and the trustees agreed to loan money from the pension fund to the welfare fund.  Id.  Despite the fact that the transaction involved no allegations of misconduct or unfair terms, we held that section 406(b)(2) had been violated.  We first wrote:

> When identical trustees of two employee benefit plans whose participants and beneficiaries are not identical effect a loan between the plans without a § 408 exemption, a per se violation of ERISA exists.

590 F.2d at 529.  See also Lowen v. Tower Asset Management, Inc., 829 F.2d 1209, 1213 (2d Cir. 1987) (noting that section 406(b) needs to be "broadly construed" and that liability may be imposed "even where there is `no taint of scandal, hint of self-dealing, no trace of bad faith'") (citations omitted); Donovan v. Mazzola, 716 F.2d 1226, 1238 (9th Cir. 1983), cert. denied, 464 U.S. 1040 (1984) (noting that per se prohibition of section 406(b) is the consistent with the remedial purpose of ERISA, for "at the heart of the fiduciary relationship is the duty of complete and

undivided loyalty to the beneficiaries of the trust") (citations omitted).  We then added:

> We have no doubt that the pension fund's loan to the welfare fund falls within the prohibition of section 406(b)(2).  Fiduciaries acting on both sides of a loan transaction cannot negotiate the best terms for either plan.  By balancing the interests of each plan, they may be able to construct terms which are fair and equitable for both plans; if so, they may qualify for a section 408 exemption.  But without the formal procedures required under section 408, each plan deserves more than a balancing of interests.  Each plan must be represented by trustees who are free to exert the maximum economic power manifested by their fund whenever they are negotiating a commercial transaction.  Section 406(b)(2) speaks of "the interests of the plan or the interests of its participants or beneficiaries."  It does not speak of "some" or "many" or "most" of the participants.  If there is a single member who participates in only one of the plans, his plan must be administered without regard for the interests of any other plan.

Id. at 530.

We interpret Cutaiar as follows.  Each defendant, in his capacity as a pension fund trustee, violated section 406(b)(2) because, in connection with the loan from the pension fund to the welfare fund, he acted on behalf of and represented the welfare fund, a party with interests that were adverse to those of the pension fund as far as that transaction was concerned.  Similarly, each defendant, in his capacity as a welfare fund trustee, violated section 406(b)(2) because, in connection with that loan, he acted on behalf of and represented the pension fund.

The district court in this case, however, read Cutaiar narrowly and, indeed, essentially limited the decision to its facts. The district court stated:

> The Secretary's reliance on Cutaiar is misplaced. As noted by the Tenth Circuit in Brock [v. Citizens Bank of Clovis, 841 F.2d 344, 347 n.2 (10th Cir. 1988), cert. denied, 488 U.S. 829 (1988),] Cutaiar did not involve a transaction with a third party. Moreover, the boards of the Plan and EMA were not identical and Compton, McHugh and Nielsen did not constitute a majority of EMA's Board . . . . Likewise, the purported "conflict of interest" violation of section 406(b)(2) is sheer hypotheses unsupported by any evidence that these three defendants––who did not control the board of EMA––acted on behalf of EMA, the adverse party to the Plan in the sale of the note.

Compton II, 834 F.Supp. at 757. We do not agree with this interpretation of Cutaiar.

Although the district court was correct in noting that the trustees on both sides of the challenged transaction in Cutaiar were identical, Cutaiar did not hold that section 406(b)(2) can be violated only when there are identical decisionmakers on both sides of the transaction. This would be contrary to the plain language of the provision. Section 406(b)(2) creates a duty against self-dealing for each individual fiduciary, not just fiduciaries as a group. Each fiduciary is prohibited from "act[ing] on behalf of an [adverse] party (or represent[ing]) an [adverse] party . . . ." Thus, a plan fiduciary may act on behalf of or represent an adverse party even if the groups controlling the plan and the adverse party are not identical. See Davidson v. Cook, 567 F.Supp. 225, 237 (E.D.Va. 1983) aff'd 734 F.2d 10 (4th Cir.), cert. denied, 469 U.S. 899 (1984)

(finding a violation of § 406(b)(2) when trustees of pension fund loaned money to corporation with close ties to the union sponsoring the plan despite fact that boards of two groups were not identical).

Likewise, the fact that Cutaiar did not, in the district court's words, involve a transaction with "a third party," 834 F. Supp. at 757, does not serve to distinguish this case. We understand the district court as opining that Cutaiar is inapposite because it involved a transaction between a fiduciary and a "party in interest," whereas the transaction at issue here was between a fiduciary and an entity other than a party in interest. This was the distinction drawn by the Tenth Circuit in Citizens Bank of Clovis, 841 F.2d at 347 n.2, on which the district court relied. See 834 F. Supp. at 757. However, we believe that this reading of Cutaiar is erroneous. First, we see no support for this interpretation in the Cutaiar opinion. That opinion never referred to either fund as a "party in interest." Nor did it mention the provision of ERISA that defines a party in interest, section 3(14), 29 U.S.C. § 1002(14), or the provision that prohibits transactions with a party in interest, section 406(a)(1), 29 U.S.C. § 1106(a)(1).[26] Second, it seems clear from the language of section 406(b)(2) that its prohibition is not restricted to conduct related to "parties in interest." Rather,

_____

[26]. Indeed, as the Secretary notes, Dept. of Labor Br. at 43 & n.22, it does not appear that the related plan in Cutaiar fell within the definition of a party in interest in section 3(14) of ERISA, 29 U.S.C. § 1002(14).

section 406(b)(2) speaks more broadly of parties "whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries."  A party clearly may have interests that are adverse to those of a plan or its participants or beneficiaries in relation to a particular transaction without being a "party in interest" as defined by section 3(14).

Cutaiar is significant for present purposes chiefly because it stands for the proposition that, when a plan loans money to or borrows money from another party, the plan and the other party will have adverse interests within the meaning of section 406(b)(2).  See 570 F.2d at 529.  It follows, therefore, that in the present case the Plan and EMA had adverse interests with respect to the sale of EMA's note.  Furthermore, it seems abundantly clear that the interests of the Plan and Local 98 were also adverse with respect to this transaction.[27]

---

[27].  This is shown clearly by the actions taken by Local 98 in connection with the purchase of EMA's note.  See generally Compton I, 834 F. Supp. at 751 n.7.  Because EMA had no money of its own, it was unable to proceed with the transaction until Local 98 approved.  JA at 96, 471. Indeed, the record indicates that the Plan trustees considered Local 98 to be the actual purchaser of the note given the fact that EMA had no funds of its own.  Since Local 98 advanced the funds to EMA necessary to purchase the note, the union's approval was a prerequisite to completing the transaction.  Id. at 58-59, 89, 448, 471.  In explaining the sale of the note, Compton also revealed that Local 98 was the effective purchaser: "The trustees felt that would be a prudent move and had to find a buyer for the market value, and that's when the union stepped in and decided they would purchase the mortgage and get rid of it at the market value."  Id. at 471 (emphasis added).  Thus, as the "real" purchaser of the note, Local 98 necessarily had interests adverse to the Plan in relation to that transaction.  See Cutaiar, 590 F.2d at 529.

Since the interests of the Plan were adverse to those of EMA and Local 98 with respect to the transaction at issue, the only remaining question under section 406(b)(2) is whether the union trustees acted on behalf of or represented EMA or Local 98 in connection with that transaction. The record strongly suggests that they did. All three union trustees were officials of Local 98, and Compton was also an officer of EMA. Moreover, the union trustees apparently did not recuse themselves when the transaction was being considered by EMA and Local 98. Instead, they participated in discussion of the mortgage transaction at board meetings of EMA and Local 98. Rec. 38 at 23; JA at 417–27, 446. While these facts in themselves may be sufficient to support summary judgment in favor of the Secretary on his section 406(b)(2) claim, we will leave that determination for the district court to make in the first instance.[28] On remand, the district court should determine whether, during EMA's and Local 98's deliberations concerning the purchase of EMA's note, the union trustees took any action in their capacities as union or EMA officers. If they did, then they took actions in this transaction on behalf of EMA and/or Local 98, parties with interests adverse to the Plan, and they therefore violated section 406(b)(2).[29]

[28]. We recognize that the evidence against Compton, who was president of EMA and Local 98, is stronger than against the other two union trustees. We are sure that on remand the district court will scrutinize this aspect on the record.

[29]. The Secretary also suggests that the union trustees violated section 406(b)(2) because, while acting in their capacities as plan trustees during the consideration of the sale of EMA's note,

## V.  Section 404(a)(1) Claims

We come, finally, to the Secretary's claims that the Plan trustees violated ERISA's loyalty and prudence requirements, sections 404(a)(1)(A) and (B) of ERISA, 29 U.S.C. §§ 404(a)(1)(A) and (B), and that Fidelity violated ERISA's requirement that fiduciaries act in accordance with plan documents, section 404(a)(1)(D) of ERISA, 29 U.S.C. § 404(a)(1)(D).  The district court did not specifically address these claims in either of its two opinions, but it did enter judgment against all defendants on "all claims against them."  Compton I, 834 F. Supp. at 751.  We agree with the Secretary that this disposition was erroneous.

In  addition to making certain actions by fiduciaries illegal per se, ERISA also codified common law duties of loyalty and prudence for ERISA trustees.  In relevant part, section 404(a) provides as follows:
>    (a) Prudent man standard of care
>
>        (1) [A] fiduciary shall discharge his duties
>        with respect to a plan solely in the interest of
>        the participants and beneficiaries and--
>
>        (A) for the exclusive purpose of:

(..continued)
they were actually serving the interests of EMA or Local 98.
This theory, although based on section 406(b)(2), seems to
resemble the Secretary's claim against all of the trustees under
section 404(a)(1)(A), which is discussed below.  However, the
Secretary has not provided a precise description of this theory
as distinct from the section 406(b)(2) theory discussed in text.
For this reason, and because it may not be necessary for the
district court to reach this theory on remand, we do not address
the validity or contours of such a theory at this time.

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . .

(D) in accordance with the documents and instruments governing the plan . . . .

Based on the summary judgment record, a reasonable factfinder could conclude that the fiduciaries violated their duties. The evidence discussed above with regards to self-dealing also supports the Secretary's argument that the trustees may have violated the duty of loyalty set out in section 404(a)(1)(A). As noted, the Plan trustees sold the note for well below its accounting value, and the record shows that the union trustees were active on both sides of the negotiations. JA at 54, 58-59, 82, 89, 91, 95-96, 106. Furthermore, the Plan trustees apparently did not sue EMA to force a purchase of the mortgage at its accounting value because that would have effectively been a suit against Local 98. Id. at 467. We agree with the Second Circuit that trustees violate their duty of loyalty when they act in the interests of the plan sponsor rather than "with an eye single to the interests of the participants and beneficiaries of the plan." Donovan, 680 F.2d at 271.

Likewise, the Secretary has adduced evidence suggesting that the Plan trustees may not have acted in a prudent manner and may

thus have violated section 404(a)(1)(B).  The Plan trustees were aware that their counsel and the Secretary considered the loan to violate ERISA.  JA at 69, 87.  Despite counsel's advice to sell the loan for its accounting value, the Plan trustees did not do so.  Furthermore, the Plan trustees appear not to have made any effort to dispose of the mortgage until two months before the end of ERISA's ten-year transition period.  The evidence indicates that Fidelity participated in these transactions, and this evidence is sufficient to support a finding that it violated section 404(a)(1)(D) by failing to exercise the authority vested in it by the Plan, which included control over Plan investments.[30]  Although not necessarily dispositive, these facts certainly provide a sufficient basis for the Secretary's claims to survive a motion for summary judgment.[31]

   We therefore reverse the order of the district court insofar as it granted summary judgment against the Secretary on these claims and we remand for further proceedings regarding them.

---

[30].  As noted, an Amendment to the Agreement of Trust between Local 98 and Fidelity provides that Fidelity "shall have exclusive authority and discretion in investment of the Fund, and to so invest without distinction between principal and income." JA at 342.

[31].  The Plan trustees argue that there was no violation of the duty of loyalty and prudence because the trustees had no superior alternative to the one they chose.  Although there is evidence to support this view, the Secretary has adduced sufficient facts to make the district court's resolution of this issue by summary judgment improper.

## VI. Conclusion

The district court's order entering summary judgment in favor of all defendants on all claims is reversed in part and affirmed in part. Given the complex nature of the transactions at issue here, we intimate no view as to the extent of the liability, if any, that should be imposed on a defendant that is ultimately found to have violated ERISA. We remand to the district court for further proceedings consistent with this opinion.